LUZ MARÍA, VIOLETA, RAFAEL y ADA CÁEZ, demandantes y recurridos, *v.* UNITED STATES CASUALTY COMPANY y LUCIANO MÉNDEZ, demandados y recurrentes.

Número 11705.

*Sometido:* 1 de marzo de 1956. *Resuelto:* 24 de septiembre de 1958.

*Emilio de Aldrey,* abogado de los recurrentes; *Bolívar Pagán,* abogado de los recurridos.

El Juez Asociado Señor Saldaña emitió la opinión del Tribunal.

No existe controversia sobre los hechos pertinentes en el caso de autos. En breve son los siguientes: Sixto Cáez sufrió un accidente de automóvil el 18 de enero de 1951, en la carretera que conduce de Juncos a Gurabo, mientras viajaba como pasajero en un automóvil dedicado al servicio público que pertenecía al demandado Luciano Méndez. Éste lo tenía asegurado y cubierto el riesgo a terceras personas con la United States Casualty Co., también demandada en este pleito. El accidente se debió únicamente a la culpa o negligencia del conductor del vehículo por los actos del cual se admitió que el dueño era responsable. A causa de la falta de cuidado del chófer, el automóvil pasó sobre un montículo de arena al lado derecho de la carretera y viró bruscamente hacia la izquierda mientras corría a una velocidad excesiva. Por tal motivo se abrió una de las puertas del vehículo y Cáez, que iba sentado al lado de la misma, se cayó sobre el pavimento de la carretera, sufriendo así fuertes contusiones en la cabeza y una laceración profunda en la región temporoparietal izquierda. También se fracturó varias costi-

llas. Fue llevado inmediatamente al Hospital Municipal de Caguas donde permaneció recluído en cama hasta el 31 de enero de 1951. Aunque en esa fecha lo dieron de alta, Cáez siguió enfermo en su casa sin poder trabajar y sometido a tratamiento médico. En 23 de febrero siguiente fué hospitalizado nuevamente a causa de los vómitos continuos y fuertes dolores de cabeza de que sufría. Al experimentar cierta mejoría salió del hospital tres días después, pero el 11 de marzo de 1951 volvió a ser ingresado en estado grave, falleciendo pocas horas más tarde como consecuencia de un hematoma extradural en el occipucio, es decir, en la región posterior e inferior de la cabeza. Dicho tumor sanguíneo entre el cráneo y el encéfalo fue producido por las lesiones que Cáez sufrió en el accidente de automóvil. En efecto, el historial clínico y el testimonio pericial demostraron (1) que el tumor fue de origen traumático; (2) que se desarrolló lentamente fuera de la dura madre, que es la más externa, gruesa y fibrosa de las tres meninges entre el cráneo y el encéfalo; (3) que Cáez no sufrió ningún otro golpe o contusión en la cabeza después del accidente de enero 18 de 1951; y (4) que el referido tumor sanguíneo le ocasionó la muerte a Cáez, como ocurre con frecuencia en esas circunstancias, varias semanas después de ocurrir el traumatismo. Por lo demás, ante nos los demandados admiten que la muerte de Sixto Cáez ocurrió como consecuencia del accidente.

Ahora bien, apenas 26 días antes de morir, Cáez firmó un contrato de transacción con ambos demandados que copiado al pie de la letra dice así:

"Por la presente hago constar, que yo (Nosotros) Sixto Cáez, de 56 años, viudo, empleado y vecino de Caguas, P. R., asistido en este acto por su sobrina, Sixta Ramírez y su abogado Lcdo. Francisco García Casanova. En virtud del pago de TRESCIENTOS SETENTICINCO ($375) recibido en este acto a mi entera satisfacción, por lo cual otorgo recibo y resguardo, en forma y sin que exista otra consideración o promesa alguna, por la presente relevo y para siempre eximo

a Luciano Méndez, Comisionado del Interior y/o United States Casualty Co. de cualquiera y todas acciones, causas de procesos, reclamaciones y demandas por, sobre o en virtud de cualquier daño, pérdida o perjuicio que hasta ahora haya sido o en adelante pueda ser sostenida por mí en consecuencia de un accidente automóvil lic. P-43338 propiedad de Luciano Méndez y manejado por el chófer José Luis Colón Avilés, ocurrido el día 18 de enero 1951 en la Carretera 30, Km. 11, Hm. 1 de Juncos a Gurabo.

"Siendo además convenido y entendido, que el pago de dichos Trescientos Setenticinco Dollars no deben interpretarse como una admisión por parte de Luciano Méndez y/o United States Casualty Company de cualquiera responsabilidad que hubiere como consecuencia de tal accidente.

"En testimonio de lo cual he firmado y rubrica en San Juan, Puerto Rico, hoy día febrero 13, 1951.

"Firmado y rubricado en presencia de (Fdo.) Sixto Cáez (firma), (Fdo.) Lcdo. Fco. García Casanova, (Fdo.) Sixta Ramírez (Firma), Caguas, Puerto Rico."

El referido contrato transaccional se hizo en un formulario impreso que la compañía de seguros había preparado para ese fin. Fué firmado en las oficinas del ajustador de reclamaciones de la compañía demandada en San Juan. Allí vino Cáez, acompañado de su abogado y de una sobrina, para ultimar los términos de una transacción que ya se había discutido previamente entre el abogado y el ajustador. La cantidad a pagarse, así como los demás términos del referido contrato, fueron objeto de amplia discusión entre las partes. Finalmente se acordó transigir por la suma indicada, tomando en cuenta un certificado médico sobre las lesiones que hasta entonces Cáez parecía haber sufrido como consecuencia del accidente. Aunque dicho certificado no fue presentado en evidencia, ambas partes admitieron en el juicio que en ese momento nadie conocía la existencia del hematoma. A simple vista, Cáez seguía enfermo de sus heridas y tenía un vendaje sobre la cabeza. Por otro lado, el tribunal sen-

tenciador determinó que Cáez estaba en condiciones mentales apropiadas para prestar su consentimiento a la transacción y que la misma fue completamente voluntaria, es decir, que no medió dolo, coacción, intimidación, fraude o influencia indebida por parte de los demandados.

Cáez era viudo y tenía cuatro hijos que son los únicos demandantes en este pleito.[1] Reclamaron indemnización por los daños y perjuicios que personalmente les causó la muerte de su padre, alegando que " . . . *a consecuencia del referido accidente, dichos demandantes han sufrido graves angustias mentales, han perdido la sociedad y compañía de su mencionado padre y han perdido la ayuda que aquél les proporcionaba y les hubiera podido proporcionar a estos demandantes, en una suma que estiman en $20,000.*" Por su parte, los demandados alegaron ante el Tribunal Superior que la transacción celebrada el 13 de febrero de 1951 constituía una defensa válida contra la acción interpuesta por los hijos de Cáez. El tribunal a quo declaró sin lugar esa contención. A base de los hechos antes consignados, dictó sentencia declarando con lugar la demanda y condenando a los demandados a pagar la suma de $8,000, en concepto de indemnización, que debía distribuirse por partes iguales entre los demandantes. Determinó además que la demandada United States Casualty Company pagaría la cantidad de $1,500, que es el límite máximo de su póliza, y que el demandado Luciano Méndez pagaría la suma restante de $6,500.

En este recurso los demandados sostienen que fue error del tribunal de instancia " . . . resolver que la transacción verificada por Sixto Cáez con la compañía aseguradora de Luciano Méndez no eliminaba el derecho de los hijos de Sixto Cáez a reclamar por la muerte de su padre . . ." Creemos que ese apuntamiento de error carece de méritos.

---

[1] Dos de ellos eran mayores de edad y vivían en Nueva York. Los otros dos eran menores y aún asistían a la escuela. Vivían en Caguas con su padre y dos tías que ayudaban a pagar los gastos del hogar.

 Los demandantes en este caso sólo reclamaron el resarcimiento de los perjuicios que ellos habían sufrido personalmente como consecuencia de la muerte de su padre. No solicitaron indemnización alguna por los daños que sufrió en el accidente la víctima inicial: es decir, Sixto Cáez. En tal caso la acción de indemnización depende exclusivamente de lo prescrito en el art. 1802 del Código Civil (ed. 1930), 31 L.P.R.A. sec. 5141. Aunque los demandantes pueden sin duda acumular sus acciones en un solo pleito, hemos rechazado la idea de que sólo existe una acción común a favor de todas las personas a quienes causó daños la muerte ilegal. Por el contrario, no existe ninguna clase de solidaridad entre las distintas acciones que surgen contra el causante de la muerte ilegal. Véase *Hernández* v. *Fournier*, 80 D.P.R. 93 (1957).(²) Es el perjuicio particular y personal sufrido por cada uno de los hijos al morir su padre que se invoca como base de la responsabilidad de los demandados en el caso de autos. Así pues, los demandantes no actúan en este pleito como herederos de Cáez, aunque lo sean, sino *iure proprio*. Véanse *Travieso* v. *Del Toro*, 74 D.P.R. 1009 (1953); *Vázquez* v. *Pueblo*, 76 D.P.R. 594 (1954) y *Fournier* v. *Fournier*, 78 D.P.R. 430 (1955).

 De ahí que no puedan confundirse las acciones de los hijos para recobrar los daños materiales y morales que les causó la muerte de su padre con la acción que pertenecía a Cáez para obtener el resarcimiento de los daños que él sufrió como consecuencia del accidente. No importa que todas surjan de un solo acto torticero. En realidad se trata de causas de acción esencialmente distintas e independientes porque tienden a la reparación de perjuicios diferentes. Así lo declaramos en *Hernández* v. *Fournier*, supra, al decir que: " . . . el perjuicio causado por la muerte de una per-

---

(²) Ante el tribunal de instancia los demandantes alegaron y probaron que ellos eran los únicos herederos de Sixto Cáez, cumpliendo así con la regla procesal que regía antes de nuestra decisión en *Hernández* v. *Fournier,* supra. Por supuesto, esa alegación y esa prueba resultan superfluas hoy día.

sona a menudo alcanza por repercusión a varias otras personas, independientemente de los daños que la lesión mortal hace sufrir a la víctima inicial. Sufren daños de orden patrimonial aquéllos a cuyas necesidades atendía el finado y también los que no recibían de él alimentos en forma real y efectiva, pero sí tenían derecho a recibirlos y, en consecuencia, pierden la esperanza fundada y razonable de esos beneficios futuros. Por otra parte, sufren daños morales las personas vinculadas por lazos de parentesco, afecto y cariño con el difunto. Poco importa que se trate de un solo acto torticero. El perjuicio material y moral que causa la muerte ilegal de un ser humano puede refluir sobre varias personas. Y en tal caso, cada una de éstas adquiere una acción independiente contra el causante de la muerte ilegal, pues la fuente de la responsabilidad es precisamente el perjuicio particular y personal sufrido por cada uno de los demandantes. De ahí que dichas reclamaciones no surgen de un derecho hereditario: cada demandante solicita indemnización por el daño que a él personalmente le causó la muerte y no actúa como heredero, aunque lo sea, ya que no reclama por los daños y perjuicios que sufrió el finado." (Págs. 97–98.)

Siendo diferentes los perjuicios por los cuales se podría reclamar indemnización, resulta obvio también que no se realizan necesariamente al mismo tiempo. Así, en el caso de autos, la acción de Cáez nació en el momento del accidente, mientras que las acciones de los hijos surgieron a la fecha del fallecimiento. De ahí también que el período prescriptivo para dichas acciones pueda ser distinto. En la práctica la fecha en que el agraviado supo del daño, que sirve de punto de partida a la prescripción, depende casi siempre del instante en que se realizaron los perjuicios. 1 Borrell y Soler, Derecho Civil Español (1955) 507–529. Por otro lado, como los hijos de Cáez no reclaman a título de causahabientes, los acreedores del padre (salvo aceptación de la herencia sin beneficio de inventario) no podrían

tener derecho alguno a la indemnización concedida porque ésta no se refiere a un crédito de su deudor sino que constituye un derecho personal de los demandantes.

Resumiendo todo lo anterior, vemos que nuestro derecho reconoce dos acciones distintas e independientes: *primero*, la acción personal de Cáez como víctima inicial del accidente por los daños y perjuicios que él sufrió; y *segundo*, la acción que pertenece exclusivamente y por derecho propio a cada hijo para reclamar indemnización por la muerte de su padre. Esto sentado, tratándose en este pleito de las acciones que corresponden a los hijos, es obvio que los demandados no pueden invocar como defensa la transacción que Cáez firmó el 13 de febrero de 1951.

 En el supuesto de que el contrato transaccional incluyó *todas* las acciones que surgieron como consecuencia de la muerte de Cáez, basta señalar que éste no podía transigir los derechos o acciones de sus hijos. Nuestro Código Civil equipara la transacción a una sentencia firme que tiene para las partes la autoridad de la cosa juzgada. No obstante, al igual que cualquier otro contrato, sólo produce efectos entre las partes y sus causahabientes considerados como tales. Nunca puede obligar a los que no intervinieron en ella. Arts. 1209 y 1715 del Código Civil (ed. 1930), 31 L.P.R.A. secs. 3374 y 4827. Por otro lado, sólo pueden transigir aquellas personas que tengan capacidad para disponer de los derechos comprendidos en la transacción. En el caso de autos, los dos hijos de Cáez que eran mayores de edad al firmarse la transacción no fueron partes en la misma. En cuanto a los otros dos hijos que en ese momento eran menores de edad, la transacción resulta nula por no haber mediado la correspondiente autorización judicial según lo prescrito en el art. 1710 del Código Civil (ed. 1930), 31 L.P.R.A. sec. 4822. Véase 4 Castán, Derecho Civil Español, Común y Foral (8ª ed., 1956) 730–745. Cáez sólo podía transigir los daños y perjuicios que él personalmente sufrió como consecuencia del accidente. Cf. *Carrasquillo* v.

*American Missionary Association*, 61 D.P.R. 867, 884 (1943) y *Sucn. Bachier* v. *Comisión de Indemnizaciones a Obreros*, 33 D.P.R. 1016, 1017–1018 (1925).

▬▬▬▬ Además, la transacción con la víctima de un accidente poco tiempo después de ocurrir el mismo, debe ser interpretada muy restrictivamente. Como es bien sabido, aun en casos ordinarios, la transacción " . . . no comprende sino los objetos expresados determinantemente en ella, o que, por una inducción necesaria de sus palabras, deben reputarse comprendidos en la misma." Art. 1714 del Código Civil (ed. 1930), 31 L.P.R.A. sec. 4826. *Canino* v. *Bellaflores*, 78 D.P.R. 778 (1955) ; 4 Castán, *op. cit.* supra; Puig Peña, Tratado de Derecho Civil Español, tomo IV, vol. II (1951). Es lógico que seamos más estrictos aún cuando la víctima está mal informada en cuanto a las circunstancias y consecuencias del accidente, bien sea porque no se da cuenta con exactitud de las mismas o porque éstas no se han manifestado todavía. No podríamos tolerar la explotación de la ignorancia, o lo que es peor, del infortunio humano. Cf. *De Jesús* v. *Singer Sewing Machine Co.*, 46 D.P.R. 719, 724 (1934). Así pues, sólo debe entenderse incluído en el contrato de transacción de fecha 13 de febrero de 1951 lo que estaba en controversia, a saber: las consecuencias previstas del accidente y aquellas que hubiesen podido preverse razonablemente. En cuanto a las consecuencias *totalmente imprevisibles* del accidente, no pudo haber intención común de incluirlas en el contrato y, por consiguiente, no fueron objeto de la transacción aludida. Nótese que ambas partes ignoraban por completo la existencia del tumor sanguíneo cuando firmaron el contrato transaccional. No se trata pues de una mera agravación del daño que las partes tomaron en cuenta al transigir. La muerte de Cáez fue en verdad una consecuencia totalmente imprevisible del accidente. De modo que los daños causados por el fallecimiento de Cáez no fueron objeto de transacción entre las partes firmantes del contrato celebrado el 13 de febrero de 1951, máxime cuando la oscuridad

sobre ese punto no debe favorecer a los demandados porque éstos fueron los que presentaron el documento a Cáez para su aceptación. Cf. la Sentencia del Tribunal Supremo de España de 15 de marzo de 1949, 26 Jur. Civ. (2ª s.) 198.

Si en este caso Cáez hubiese recibido antes de morir, mediante transacción o sentencia, una indemnización basada en una lesión o incapacidad grave y permanente, el avalúo del perjuicio necesariamente hubiera incluído la disminución en sus ingresos durante la vida futura estimada (*"life-expectancy"*). O sea, Cáez hubiera obtenido como compensación el capital indispensable para sustituir la pérdida en ingresos durante el resto de su vida. En tal caso, la cuantía del daño material sufrido por los demandantes como consecuencia de la muerte de Cáez, hubiese sido menor y dependería del grado de incapacidad fijado en la sentencia o previsto por las partes en la transacción. Cf. Prosser, *Hand-Book of the Law of Torts* (2ª ed., 1955) 705–719; 2 Harper y James, *The Law of Torts* (1956) 1291–1295; McCormick *on Damages* (1935) 299–374; y McCormick y Fritz, *Cases and Materials on Damages* (1952) 250–376. Pero, habiéndose equivocado las partes en cuanto a la *naturaleza* del accidente, equivaldría a desnaturalizar el sentido de la transacción si incluyéramos en ella la reparación de una incapacidad seria y permanente. No podría concluirse aquí que las partes transigieron las acciones provenientes ni de una lesión permanente ni de la muerte de Cáez.

Dadas las anteriores conclusiones, es innecesario resolver si la transacción entre Cáez y los demandados fue nula debido a un error de hecho esencial que recae sobre la sustancia o la causa del contrato, como alegan los demandantes en su alegato. Véanse: art. 1716 del Código Civil (ed. 1930), 31 L.P.R.A. sec. 4828; Moxó, Notas sobre la Naturaleza de la Transacción, 34 Rev. Der. Priv. 673 (1950) ; Sanahuja, Consideraciones sobre la Naturaleza del Contrato de Transacción y Principales Cuestiones que Plantea, 29 Rev. Der. Priv. 230 (1945) ; 11 Planiol y Ripert, Tratado Práctico de

Derecho Civil Francés (trad. esp. 1940) 959 y sigtes.; Puig Brutau, Fundamentos de Derecho Civil, tomo II, vol. II (1956) 563–583; y Puig Peña, *op. cit.* supra, 526–529. Cf. Corbin *on Contracts* 356 y sigtes.; 5 Williston *on Contracts* (ed. rev.) 47 y sigtes.

*Debe confirmarse la sentencia recurrida.*