Isidoro Infante y su esposa Mercedes Sánchez de Infante, demandantes y recurrentes, *v.* Bob Leith y Richard Penn, demandados y recurridos.

*Número:* 12352 *Resuelto:* 15 de marzo de 1962

28

*R. Arjona Siaca,* abogado de los recurrentes; *F. Fernández Cuyar* y *Rafael A. González,* abogados de los recurridos.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ MATOS emitió la opinión del Tribunal.

Los recurrentes Isidoro Infante y su esposa Mercedes Sánchez residían para el 14 de febrero de 1955 en la Urbanización Villa Caparra del Municipio de Guaynabo. Cercanas a su residencia estaban las de los recurridos Bob Leith y Richard Penn. Los primeros eran dueños de un pequeño perro "fox-terrier" llamado "Nerón" que diez años antes les había regalado un amigo. Bob Leith era dueño de "Blackie", un perro policía de gran tamaño. Richard Penn era dueño de "Pennie", una perra policía también de gran tamaño.

En la tarde de ese día y en los momentos en que la señora Sánchez de Infante se encontraba en su hogar, Blackie y Pennie invadieron el patio de la residencia de los esposos Infante-Sánchez donde se encontraba Nerón cavando un hoyo para ocultar una presa. Atacaron simultáneamente a Nerón, mordiéndolo repetidamente, sacudiéndolo "como tratando de partirlo en dos partes." T-7. Lo que quedó del infeliz Nerón fue conducido a la clínica veterinaria del Dr. López Pacheco, donde se le operó con anestesia general, administrándosele oxígeno durante las tres horas que tomó la operación y después antibióticos por varios días.

Con motivo de esta tropelía y de otras incursiones y conducta anteriores de los animales de los recurridos, los esposos Infante-Sánchez instaron acción contra sus dueños para recobrar los daños y perjuicios resultantes y para que se les ordenara mantener, dentro de sus propiedades, a sus respectivos perros.

Contestaron los demandados impugnando la suficiencia de la demanda, negando en términos generales sus alegaciones principales y afirmando que el accidente se debió a la negligencia de los esposos demandantes o a un hecho fortuito e inevitable.

Celebrado el juicio y sometido el pleito para su decisión, el tribunal de instancia lo falló concediendo a los demandantes únicamente los gastos efectuados para curar a su pequeño perro, ascendentes a $98, más las costas y $140 de honorarios de abogado. Formuló las siguientes conclusiones:

"CONCLUSIONES DE HECHO.—Los demandantes son marido y mujer, residen en la Urbanización Villa Caparra de Guaynabo, y son dueños de un perro 'fox-terrier' de diez años, el cual cuidan con sumo esmero y al que le tienen un gran afecto.

"El 14 de febrero de 1955, una perra grande de Richard Penn y un perro también robusto de Bob Leith entraron al patio del hogar de los demandantes y atacaron a la vez al pequeño perro de los demandantes, produciéndole a éste tres heridas grandes y varias pequeñas, la fractura de una costilla y de varios cartílagos de otras. Éste fue llevado al hospital para animales López-Díaz, donde un veterinario lo operó. Allí estuvo hospitalizado cinco días y después fue conducido al hogar de los demandantes. En el undécimo día le cortaron las suturas y después fue dado de alta. Durante los dos primeros días de estas lesiones el veterinario informaba a la demandante que el pronóstico era reservado, lo que mantuvo a esta señora en un estado de pena y de sufrimiento durante este tiempo ante la incertidumbre de si su querido perro sobrevivía. Los gastos de hospitalización, medicina y honorarios del veterinario ascendieron a $98.

"No hay evidencia alguna de que los hechos aquí narrados fueron causados por fuerza mayor ni de que la culpa o negligencia de los mismos pueda atribuírsele al 'fox-terrier' o a sus dueños.

"CONCLUSIONES DE DERECHO.—1. Es de clara aplicación a este caso el Artículo 1805 de nuestro Código Civil (31 L.P.R.A. 5144). Véanse los casos de Galarza v. Llinás, 71 D.P.R. 111 y decisiones anteriores en el mismo sentido de nuestro Tribunal Supremo.

"2. La demandante reclama compensación por los sufrimientos morales que tuvo como consecuencia de ver a su perro lesionado y en peligro de muerte. No nos ha podido citar precedente judicial alguno que nos dé base para concederle indemnización por ese daño. No obstante, los argumentos que pueden levantarse en apoyo de su contención para ser aplicables los Artículos 1802 y 1803 de nuestro Código Civil, son de tales méritos que producen cierta duda en la mente del juzgador sobre la sabiduría de concederla. No es éste el momento oportuno para que este tribunal entre en disquisiciones sobre las bondades o argumentos de que esa clase de daños sean o no reparables. De todos modos, ante la duda, debemos regirnos por la doctrina general de los tribunales de los Estados Unidos de denegar indemnización por esos sufrimientos morales a los dueños de perros que han muerto o que han sido lesionados. Véanse las páginas 1345, 1346 y 1347 del tercer tomo de Corpus Juris Secundum.

"3. No se ha probado inminencia de que los perros de los demandados tratan de volver a entrar a la propiedad de los demandantes, por el contrario la perra [sic] del codemandado Roberto Leith apareció muerta tres semanas después de los hechos de este caso."

Apelaron del fallo los demandantes sosteniendo ante nos que erró el tribunal a quo (1) "al no considerar como perjuicio indemnizable la perturbación sufrida por los demandantes en el tranquilo disfrute de su propiedad con motivo de la invasión e intrusión en la misma por los perros de los demandados" y (2) "al no considerar como daño o perjuicio indemnizable los trastornos fisiológicos y emocionales, incluso la angustia y sufrimiento mental de la demandante, debidamente probados, con motivo de los hechos objeto del litigio."

I. El elemento de daños y perjuicios por perturbación en el disfrute de su propiedad y su cuantía estimada en $1,500, fueron separada y específicamente alegados. En la súplica de la demanda se solicitó su pago. Los incontrovertidos testimonios de Domingo Torres y de la señora Sánchez de Infante demostraron que por espacio de un año los perros de los demandados—sin que éstos trataran de impe-

dirlo a pesar de que tenían aviso de ello—estuvieron invadiendo el hogar de los demandantes ocasionándoles molestias, hasta el punto de que en ocasiones en que la señora regresaba a su hogar encontraba a esos dos grandes perros acostados en el balcón de su casa y ella no se atrevía a entrar por temor a que la atacaran y tenía que permanecer sentada en su automóvil hasta que los perros salieran de su propiedad.

El testigo Francisco Rosario Pérez, Juez de Paz de Guaynabo, refiriéndose a uno de los demandados, declaró sin que fuera contradicho, que cuando lo requirió "para que amarrara el perro," le dijo ese codemandado: "Seguro que yo no lo amarro, porque ese perro paga un gran seguro y el seguro es responsable de lo que haga el perro." T. 19–20.

A pesar de esas alegaciones y su correspondiente prueba, el tribunal a quo no formuló conclusiones sobre esa parte de la reclamación, ni los demandantes le solicitaron conclusiones adicionales bajo la antigua Regla 52 (b). ■

Reconoce nuestra Constitución como uno de los derechos fundamentales del ser humano el del disfrute de la propiedad; reconoce también que toda persona tiene derecho a protección de ley contra todo ataque abusivo a su vida privada y familiar.—Art. II(7) y (8). Nuestro Código Civil concede el derecho a gozar, usar y disfrutar de las cosas, y a ser respetado en ello, sin más limitaciones que las establecidas por las leyes. Artículos 280, 281 y 375. ■

Los demandantes no estaban obligados a sufrir las molestias, incomodidades y perturbaciones que en su propio hogar les ocasionaban las frecuentes invasiones de los perros de los demandados, ni a encontrarse sometidos al constante temor de un ataque repentino por esos animales. Consideramos que en esas circunstancias también era de aplicación el Art. 277 del Código de Enjuiciamiento Civil que dispone:

*"Todo lo que fuere perjudicial a la salud,* indecente u ofensivo a los sentidos, *o que interrumpa el libre uso de la pro-*

*piedad, de modo que impida el cómodo goce de la vida o de los bienes, constituye una perturbación que da lugar a una acción.* Dicha acción podrá ser promovida por cualquiera persona cuyos bienes hubieren sido perjudicados *o cuyo bien-estar personal resulte menoscabado* por dicha perturbación; y la sentencia podrá ordenar que cese aquella *así como decretar el resarcimiento de los perjuicios."* (Énfasis suplido.) ■

II. Los demandados no adoptaron medios de previsión, convenientes y adecuados, para evitar las actividades peligrosas y lesivas de sus animales. Violaron su deber de tomar las precauciones indispensables para evitar daños al público en general y a sus vecinos en particular. En estos casos esa violación constituye la causa próxima y eficiente del daño causado.

Dispone el Artículo 1805 de nuestro Código Civil:

"El poseedor de un animal, o el que se sirve de él, es responsable de los perjuicios que causare, aunque se le escape o extravíe. Sólo cesará esta responsabilidad en el caso de que el daño proviniera de fuerza mayor, o de culpa del que lo hubiere sufrido." ■

El tribunal de instancia determinó que el daño no provino de fuerza mayor ni de culpa de la señora Sánchez de Infante. En tales condiciones la seria responsabilidad de los demandados por los perjuicios causados por sus animales era absoluta. Se trata de una responsabilidad especial que se impone por el mero hecho de poseer tales animales, presumiéndose el consentimiento tácito del poseedor de responder de todas sus consecuencias, ya que no se le oculta a éste la ineficacia relativa al cuidado y vigilancia de seres irracionales. No es necesario probar culpa o negligencia de ellos, ni que los animales eran bravos, feroces y viciosos. [1]

---

[1] Véanse: *Serrano* v. *López,* 79 D.P.R. 979, 983 (1957); *Galarza* v. *G. Llinás & Cía.,* 71 D.P.R. 111, 117 (1950); *Beltrán* v. *Sucn. J. Serrallés,* 70 D.P.R. 86, 88 (1949); *Ruiz* v. *Solís,* 61 D.P.R. 815, 816 (1943); *Vázquez* v. *Laugier,* 60 D.P.R. 414, 416 (1942); *Vélez* v. *Orozco,* 59 D.P.R. 518, 520 (1941); *Andino* v. *Central Victoria, Inc.,* 57 D.P.R. 310, 320 (1940); *Ferrer* v. *Rivera,* 56 D.P.R. 504, 507 (1940); *De Jesús* v.

Después de relatar el ataque a Nerón del 14 de febrero de 1955 y sus resultados, alegaron los demandantes:

"4. Los demandantes habían tenido con ellos la compañía de su pequeño perro, prodigándole cuidados y cariños desde hace más de 10 años y los hechos que se expresan en el apartado 3 de esta demanda les ocasionaron, especialmente a la demandante Mercedes Sánchez de Infante, intensa angustia moral, trastornos nerviosos, molestias y mortificaciones que los demandantes valoran en no menos de $1,500, habiendo tenido, además, los demandantes que invertir una suma mayor de $100 en la atención de las lesiones que sufrió su pequeño 'fox-terrier.' "

Ya hemos visto que el tribunal de instancia hizo constar en sus conclusiones, entre otras cosas, lo siguiente:

"Durante los dos primeros días de estas lesiones el veterinario informaba a la demandante que el pronóstico era reservado, lo que mantuvo a esta señora en un estado de pena y de sufrimiento durante este tiempo ante la incertidumbre de si su querido(²) perro sobrevivía."

*Arzuaga*, 53 D.P.R. 522, 526 (1938); *Osorio* v. *Taboada*, 52 D.P.R. 806, 811 (1938); *Troche* v. *Matos*, 52 D.P.R. 282, 284 (1937); *Gigante* v. *Álvarez*, 48 D.P.R. 498, 507 (1935); *Torres* v. *Dávila*, 47 D.P.R. 315, 317 (1934); *Colón* v. *Pérez*, 27 D.P.R. 748, 749 (1919); *Redinger* v. *Crespo*, 18 D.P.R. 108, 111 (1912).

(²)Lo siguiente demuestra el afecto de la señora Sánchez de Infante hacia su perro:

"P. ¿Cómo llegó a poder de ustedes ese perro?

"R. Me lo regaló el señor Quiñones, juez de Bayamón. Lo trajo de Miami.

"P. ¿Cuánto tiempo hace que ese perrito los acompaña a ustedes?

"R. Hace diez años está con nosotros.

"P. Señora, explique al Tribunal cuál ha sido el trato y atención que ha recibido ese perro en su casa, desde que llegó hasta la fecha.

"R. Yo lo considero como si fuera un niño en la familia. Lo cuido igual que si fuera un hijo. Tiene su cuarto especial para él.

"P. ¿Usted, señora, está al tanto de la alimentación de ese perrito?

"R. Yo misma personalmente se la preparo.

"P. ¿La alimentación de ese perrito ha consistido en qué?

"R. Él nunca ha sido muy amante de la carne en lata; siempre ha comido costillitas de res y eso.

"P. ¿Esa alimentación se la regalan para él?

"R. No, señor. Yo personalmente la compro.

"P. ¿Por qué?

La evidencia de los demandantes demostró, además que la señora Sánchez de Infante se encontraba en el sótano de su casa en los momentos en que Nerón fue atacado por Blackie y Pennie; que ese ataque ocurrió en el jardín; que ella sintió "de momento un revolú como cuando están peleando perros" y salió corriendo y le pidió al testigo Domingo Torres que los separara; que ella no lo hizo temiendo "que me fueran a saltar encima"; según el testimonio de Torres cuando él llevó al perrito herido al garage "la señora Infante se puso en un estado de nervios que le dio un 'shock' fuertísimo." El veterinario declaró que Nerón "recuperó lo

"R. Porque a mí me gusta escogerla. Yo la escojo porque si uno pide a veces dos libras de carne para perro lo que echan es piltrafa y a él le gustan mucho las costillitas, eso que le dicen carne de pecho.

"P. ¿Carne de pecho?

"R. Sí, de lomo. Y yo misma se la cocino y yo misma se la sirvo.

"P. ¿Ese perrito, fuera del tiempo en que ha estado en la clínica del doctor López Pacheco, ha dormido fuera de su casa?

"R. Nunca. Él tiene su cuartito. Yo le tengo una alfombra, no esas de felpa calurosas, sino una de esas que son como de unos hilos.

"P. ¿Quién personalmente lo baña?

"R. Yo personalmente lo baño.

"P. ¿Él se ha enfermado alguna vez?

"R. Una vez solamente, en noviembre, que me le dio una cosa que lo llevé donde el doctor López Pacheco.

"P. ¿Cuándo fue eso?

"R. En noviembre del cincuenta y cuatro. Se lo llevé inmediatamente al doctor López Pacheco y me dijo que era bronquitis que tenía.

"P. ¿Fue gratis la atención del doctor?

"R. No, señor. Yo le pagué.

"P. ¿Dijo usted que ese perrito era querido en su casa como si fuera un miembro de la familia?

"R. Sí, señor. Como un niño.

"P. ¿Quiénes más viven en su casa?

"R. Pues mi hija y mi esposo.

"P. ¿Su hija es ya grande?

"R. Una señorita.

"P. ¿Usted sacaba de paseo ese perro?

"R. Por la calle no acostumbraba porque tenía miedo que viniera un perro y me lo estropeara. Yo siempre lo sacaba en el carro a pasear

"P. ¿Como cuántas veces a la semana?

"R. Algunas veces dos veces a la semana; cuando puedo.

"P. ¿Ese perro es sato?

"R. Bueno, da la impresión. Y a mí me disgusta cuando me le dicen sato porque en realidad no lo es. Lo parece." (T. págs. 36–38.)

suficiente para vivir; pero no para presentar un aspecto saludable después", y que era muy improbable que volviera a ser un animal saludable. (³)

Como hemos visto el tribunal de instancia se negó a conceder compensación por "los sufrimientos morales que tuvo como consecuencia de ver a su perro lesionado y en peligro de muerte." Expresó "cierta duda en la mente del juzgador sobre la sabiduría de concederla," y que ante la duda "debe-

---

(³) Sobre las angustias mentales de la demandante, de la transcripción tomamos lo que sigue:

"P. Señora, conteste la pregunta:

¿Con motivo de haber presenciado usted el ataque a su perrito por parte de esto dos perros grandes que se han mencionado aquí; con motivo de haber visto usted eso y de lo que le ocurrió a su perrito, qué le ocurrió a usted?

TESTIGO:

"R. Yo estuve enferma más de dos semanas.

"P. ¿Qué tenía usted?

"R. El sistema nervioso lo tenía alterado. No podía ni guiar el automóvil.

"P. ¿Usted comía bien?

"R. No podía comer.

"P. ¿Usted dormía bien?

"JUEZ: Pero deje que ella explique.

"DEMANDANTE:

"P. Dígale al Tribunal todo lo que le ocurrió a usted.

"TESTIGO:

"R. Mire, señor juez, yo no dormía. La noche que yo llevé al perro a la clínica con mi hija me la pasé en claro; y amanecí en la clínica a ver si el perro vivía o moría, porque el doctor dijo que había hecho todo lo humanamente posible para salvarlo, pero que no podía asegurarlo. Y al otro día también, cuando mi esposo vino a almorzar, no pude ni atenderlo, porque ¡figúrese! que cuando mi hija se fue para España, ese perrito era mi compañía.

"P. ¿Y en qué estado estaba el ánimo suyo?

"R. Pues, ya le digo, el sistema nervioso . . . bueno, que no podía hacer nada. Tenía dolor de cabeza; mi esposo tenía que estarme poniendo inyecciones."

El Juez de Paz de Guaynabo, a preguntas de la parte demandada, en parte declaró:

"P. ¿Observó usted si ella estaba allí nerviosa?

"R. Sí. Estaba un poquito histérica.

"P. ¿Cuando usted dice histérica qué es lo que quiere usted decir?

"R. Que se veía como con lágrimas en los ojos; y se veía con la inquietud ésa, propia de la mujer que pierde algo de lo que quiere."

(T. págs. 45–46 y 66.)

mos regirnos por la doctrina general de los tribunales de los Estados Unidos de denegar indemnización por esos sufrimientos morales a los dueños de perros que han muerto o que han sido lesionados." ▮

Estimamos que los sufrimientos morales aquí reclamados son (1) los que tuvo la señora Sánchez de Infante estrictamente como resultado de haber ocurrido el ataque a su perro casi en su inmediata presencia, y (2) los experimentados por ella al ver a su perro lesionado, en peligro de muerte y luego convertido en un animal casi inútil. ▮

No tenemos que depender de la regla universal de que todo hecho ilícito del hombre que cause daño a otro, realizado intencional o negligentemente, es fuente de obligación, para concluir que en ambos aspectos los sufrimientos morales que tuvo la señora deben ser indemnizados. La realidad de esos perjuicios no ha sido puesta en duda. La amplitud preceptiva de nuestro artículo 1805 no deja lugar a dudas sobre la procedencia de la concesión en estos casos de todos los daños y perjuicios realmente sufridos bien en forma inmediata o directa o bien en forma mediata o indirecta, o que posible y necesariamente se deriven del o sigan al hecho lesivo. No establece distinción entre las clases de daños y perjuicios a compensarse. ▮

En *Ruiz* v. *Solís*, 61 D.P.R. 815 (1943) confirmamos la sentencia apelada que concedió indemnización por "sufrimientos físicos y angustias mentales" causados por los actos de una perra cuyos servicios utilizaba la parte demandada; en *Vélez* v. *Orozco*, 59 D.P.R. 518 (1941) se reclamaban daños por "intensas crisis nerviosas", sufridas por la parte demandante como consecuencia de haber sido atacada por un perro y confirmamos la sentencia que los concedió, y lo mismo hicimos en *Gigante* v. *Álvarez*, 48 D.P.R. 498 (1935), donde se concedió compensación por "intensas crisis nerviosas, desvelos, insomnios, intranquilidad, angustias mentales

y morales" sufridos por actos realizados por un perro policía llamado Nerón.

Hace bastante tiempo censuramos la doctrina del Common Law que exige que haya ocurrido un "impacto" antes de que se puedan recobrar daños morales o mentales, por obsoleta y por no proteger un interés importante de la personalidad humana. —*Rivera* v. *Rossi*, 64 D.P.R. 718, 724 (1945); *Vázquez* v. *Pueblo*, 76 D.P.R. 594, 601 (1954); véanse *Hernández* v. *Fournier*, 80 D.P.R. 93, 99 (1957) y *Cáez* v. *U. S. Casualty Co.*, 80 D.P.R. 754, 761 (1958).([3a]) ▆

Un tribunal no tiene arbitrio absoluto para negar o conceder la reparación de los daños y perjuicios causados, con arreglo a su discrecional criterio, sino lo que fuere procedente conforme a lo que haya sido probado. Comprendemos que la operación resarcitoria se hace más difícil cuando en la estimación económica entran en juego elementos que no son tan ostensibles como el daño o lesión física. Pero si se determina que los perjuicios se han producido y que son consecuencia inmediata o mediata del hecho lesivo o que se ha derivado de él de un modo u otro, o que necesariamente siguen al mismo, debe procederse a la fijación del *quantum* económico que los compensa tomando en cuenta las circunstancias específicas de cada caso. Desde luego, cuando entra un elemento subjetivo en la determinación cuantitativa de los daños, —como es el valor de sentimiento, de afección o el apego a la cosa—el juzgador está constantemente expuesto a una excesiva ponderación por parte del actor. Pero, como dijimos en *Arcelay* v. *Sánchez*, 77 D.P.R. 824, 850 (1955), entonces queda al sano juicio, la experiencia y discreción del juzgador señalar la cuantía necesaria y justa para compensar los daños y perjuicio sufridos. ▆

---

([3a]) Véase el interesante resumen que del Derecho norteamericano sobre daños morales hace el profesor Howard L. Oleck en su reciente obra *"Damages to Persons and Property"*, (ed. Central Book Co., N. Y., 1955), págs. 252–253.

¿Proceden compensarse las angustias mentales sufridas por la señora Sánchez de Infante al ver a su perro lesionado, en peligro de muerte y luego convertido en un animal casi inútil? Resolvemos que sí. No concebimos razón lógica o principio de justicia que nos induzca a resolver en la negativa. ■

En nuestra legislación están considerados los animales como objetos de derecho, susceptibles de formar parte de relaciones reales y contractuales.(3b) Constituyen parte del patrimonio individual. Sobre ellos, así como sobre los demás bienes que posee el hombre, se ejerce el derecho de disfrute, considerado uno "fundamental del ser humano." —Constitución, Art. II(7).—El afecto y el apego a su pequeño perro, el deleite y regocijo que su compañía de diez años proporcionaba a ella eran reflejos o manifestaciones de ese disfrute. A la invasión a ese patrimonio sentimental tuvieron que seguir la pena y las angustias que según la evidencia sufrió la señora Sánchez de Infante. Como dijo el juez de instancia, a la demandante se mantuvo "en un estado de pena y de sufrimiento durante ese tiempo ante la incertidumbre de si su querido perro sobrevivía." Y como declaró elocuentemente el Juez de Paz refiriéndose a ella: ". . . se veía como con lágrimas en los ojos; y se veía con la inquietud ésa, propia de la mujer que pierde algo de lo que quiere." ■

---

(3b) "En las antiguas legislaciones se consideró a los animales, en algunas ocasiones, como sujetos de derecho, especialmente como sujetos de delito. Durante la Edad Media fueron frecuentes la celebración de procesos, rodeados de formulismos y trámites procesales, contra animales. En estos procesos, contra sanguijuelas, ratas, langostas, etc., se citaba a dichos animales por edictos, se les juzgaba en rebeldía y se dictaba sentencia decretando su exterminio.

"En España, durante la Edad Media, se encuentran casos de procesos contra animales y en el Derecho histórico existen algunos fueros que exigen responsabilidad a los animales y en otros se les exime de ella, lo cual hace suponer que no excluían la posibilidad de considerar los animales como sujetos de derecho." —Nueva Enciclopedia Jurídica, Tomo II, págs. 670–671.

El artículo 1802 no tenía aplicación al caso. La hubiera tenido de haberse demostrado que los perros habían sido previa y dolosamente instigados por sus dueños a causar los daños.—Véase Scævola, Tomo XXXI, pág. 514, ed. 1961. ▪

Las circunstancias concurrentes en los casos de *Díaz* v. *Palmer*, 62 D.P.R. 111 y *Díaz* v. *Emanuelli*, 61 D.P.R. 888, invocados por los recurridos, no guardan analogía con las del presente. La mera destrucción de un pequeño y desocupado rancho de paja de caña comprado en $15, en el primer caso, y la alegada pérdida de frutos y de dos animales no debida a actos de los demandados y sí a la conducta del propio demandante en el segundo, no podían causar los remotísimos daños morales reclamados en ambos casos y en los cuales las partes demandadas habían sido absueltas de toda responsabilidad por los daños materiales. Negamos en ellos compensación bajo las disposiciones del art. 1058 que prescribe que "fuera de los casos expresamente mencionados en la ley, y de los que así lo declare la obligación, nadie responderá de aquellos sucesos que no hubieran podido preverse, o que previstos, fueren inevitables." Bajo el art. 1805 el poseedor del animal es responsable de los perjuicios que causare "aunque se le escape o extravíe." Es decir, ya fuere previsible o evitable o ya fuere imprevisible o inevitable el suceso causante del perjuicio, siempre tiene que compensar el perjuicio, salvo, desde luego, que el daño proviniera de fuerza mayor o de culpa del que lo hubiere sufrido. —Véase Manresa, Tomo 12, pág. 679, 5ta. ed. (1951). No hay que probar, como afirman los recurridos, que el dueño del animal tiene conocimiento de que resulta un peligro dejarlo suelto y a pesar de ello le permita ambular libremente y sin tomar las precauciones debidas, ni que tenga conocimiento de que el animal tiene propensiones viciosas. Es más, en esta clase de daños no se admite la prueba de

la diligencia propia de un buen padre de familia que se permite por el último párrafo del art. 1803. —Véase los casos de *Beltrán* v. *Sucn. Serrallés* y *Ferrer* v. *Rivera,* ya citados.

*Por lo expuesto resolvemos que el tribunal de instancia incidió en los errores señalados por los recurrentes y que tomando en consideración las circunstancias del caso el fallo debe ser modificado a los efectos de conceder a los esposos recurrentes, además de las cantidades concedidas por gastos incurridos en la curación de su perro y honorarios de abogados, la suma adicional de $1,500 por todos los perjuicios sufridos por ellos; y así modificada, se confirmará la sentencia apelada.* (⁴)

---

(⁴) No podemos dejar de pasar inadvertida la inusitada afirmación del juez de instancia de que "ante la duda, debemos regirnos por la doctrina general de los tribunales de los Estados Unidos de denegar indemnización por esos daños morales a los dueños de perros que han muerto o que han sido lesionados.".

Es cierto que este Tribunal siempre ha tenido la tendencia de reconocer al ciudadano el pleno beneficio de los sistemas jurídicos—el del *Common Law,* en su versión norteamericana, y el de Derecho Civil— hasta llegar a formar uno que integre lo más justo de ambos.—Cf. *Sosa* v. *Sucn. Morales,* 58 D.P.R. 360, 363 (1941)—, y que ha aceptado como buena guía para la exégesis estatutaria la interpretación dada a una ley por el tribunal más alto del estado de donde proceda; sin embargo, con muy pocas excepciones, siempre se ha resistido a adoptar doctrinas y principios proclamados por esos tribunales continentales que se encuentren en conflicto fundamental con nuestra tradición jurídica y nuestro modo de vivir como pueblo.

El artículo 7 de nuestro Código Civil, en su segundo párrafo dispone que cuando no haya ley aplicable al caso, el tribunal resolverá conforme a equidad, que quiere decir que se tendrá en cuenta la razón natural de acuerdo con los principios generales del derecho y los usos y costumbres aceptados y establecidos. Como hemos visto, sobran disposiciones de ley aplicables al caso y en muchas de nuestras decisiones se encuentran precedentes bastantes para la resolución de los problemas planteados. Jamás hemos considerado derecho supletorio en Puerto Rico a "la doctrina general de los tribunales de los Estados Unidos" relativa a cualquier problema jurídico.