

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Alfredo Rolón López<br><br>Peticionario<br><br>v.<br><br>Departamento de Agricualtura<br>Estado Libre Asociado de P.R.<br><br>Recurridos | Certiorari<br><br>2010 TSPR 139<br><br>179 DPR ____ |

Número del Caso: AC-2008-0101

Fecha: 20 de julio de 2010

Tribunal de Apelaciones:

Región Judicial de San Juan

Panel integrado por su Presidente, el Juez Martínez Torres, la Juez Feliciano Acevedo y el Juez Escribano Medina:

Abogada de la Parte Peticionaria:

Lcda. Cindy Badano Rosado

Oficina del Procurador General:

Lcda. Valerie Díaz Aponte
Procuradora General Auxiliar

Materia: Infracción Ley 158 de 23 de julio 1998

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Alfredo Rolón López

   Peticionario

    v.                          AC-2008-101     Certiorari

Departamento de Agricultura,
Estado Libre Asociado de P.R.

   Recurridos


SENTENCIA

San Juan, Puerto Rico, a 20 de julio de 2010.

En mayo de 2008, un agente de la Policía de Puerto Rico intervino con el Sr. Alfredo Rolón López al percatarse de que tenía una cachorra Pitbull en su hogar, en violación a la Ley Núm. 158 de 23 de julio de 1998, 5 L.P.R.A. secs. 1601 *et seq*. A raíz de esta intervención, el Departamento de Agricultura emitió una orden de eutanasia al amparo de dicho estatuto en la que se dispuso que debe ser sacrificada.

Inconforme, el señor Rolón López solicitó al Departamento de Agricultura la celebración de una vista administrativa. Tras celebrarse la vista, el oficial examinador recomendó al Secretario de Agricultura confirmar la orden de eutanasia. El

Secretario, por su parte, acogió el informe del oficial examinador y confirmó la referida orden.

El señor Rolón López acudió al Tribunal de Apelaciones mediante recurso de revisión. Alegó, en síntesis, que la Ley Núm. 158, *supra*, es inconstitucional ya que adolece de vaguedad, viola el derecho al debido proceso de ley sustantivo y a la igual protección de las leyes. Adujo, además, que la vista que se le proveyó violó su derecho al debido proceso de ley procesal. El Tribunal de Apelaciones determinó que la Ley Núm. 158, *supra*, no adolece de vaguedad y que la vista fue celebrada conforme a derecho, por lo que confirmó la orden de eutanasia.

Inconforme aún, el señor Rolón López acude ante nos mediante recurso de apelación, el cual acogimos como un recurso de *certiorari*. En éste reitera los argumentos que formuló ante el foro apelativo intermedio. Mediante resolución emitida el 8 de mayo de 2009 expedimos el auto de *certiorari*.

Examinados los escritos de las partes, este Tribunal se encuentra igualmente dividido en cuanto a la correcta resolución del caso, por lo que se confirma la Sentencia del Tribunal de Apelaciones.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Pabón Charneco hace constar su conformidad:

> Por entender que la Ley Núm. 158 de 23 de julio de 1998, 5 L.P.R.A. sec. 1601 *et seq*, que prohíbe la posesión y venta de los perros Pitbulls en Puerto Rico, es constitucional. No cabe duda que los perros, al igual que el resto

de los animales, merecen ser tratados con humanidad y respeto por parte del ser humano. Asimismo, reconozco que los perros son propiedad bajo el palio de nuestra Constitución. Empero, coincido con el Profesor Miguel Velázquez Rivera cuando señala que 'el Estado puede ejercer su poder de razón de estado prohibiendo la posesión de [Pitbulls], y aun ordenando el sacrificio de los mismos'. M. Velázquez Rivera, *Validez Legal de la Reglamentación por la Asamblea Legislativa de la Importación, Venta y Posesión en Puerto Rico de Perros de la Raza Pit Bull*, 63 Rev. Jur. U.P.R. 1, 15 (1994).

Tanto de la Ley Núm. 158, *supra*, como de su historial legislativo, se desprende que el interés del Estado es prevenir que los Pitbulls ocasionen daño a los seres humanos. Ello, debido a que se consideran una amenaza para la población en general por su inherente agresividad y peligrosidad. Por eso, la Ley Núm. 158, *supra*, busca reducir la población de los Pitbulls por medio de su confiscación. Por lo anterior, entiendo que existe una relación racional, real y sustancial, entre el interés del Estado en proteger la ciudadanía por medio de su *police power*, y el medio empleado para protegerlo, que es la confiscación de los perros Pitbulls. Por lo tanto, la Ley Núm. 158, *supra*, no viola el debido proceso de ley en su vertiente sustantiva.

Por las mismas razones, soy del parecer que dicha ley tampoco viola la igual protección de las leyes. La Ley Núm. 158, *supra*, no establece una clasificación sospechosa. Por eso, al aplicar el escrutinio de mera racionalidad, el interés del Estado está más que justificado al prohibir la posesión exclusiva de esa raza de canes. Es decir, existe una relación racional entre la clasificación que establece la mencionada ley y el propósito gubernamental de proteger a los seres humanos.

El Juez Asociado señor Kolthoff Caraballo hace constar que se une a las expresiones de la Jueza Asociada señora Pabón Charneco:

Por entender -como ésta concluye- que existe en la Ley Núm. 158 de 23 de julio de 1998, 5 L.P.R.A. 1601 *et seq*, una relación real y sustancial con el interés estatal que esta ley persigue. *Defendini Collazo et al. v. E.L.A.,*

*Cotto*, 134 D.P.R. 27, 74 (1993). Como se señala en el Informe Conjunto de las Comisiones de Agricultura y lo Jurídico Penal de la Cámara de Representantes sobre el P. de la C. 595 de 19 de junio de 1998, 3ra Sesión Ordinaria, 13ra Asamblea Legislativa, págs. 2-3:

> Se estima que para 1996, y según informó el Centro de Control de Enfermedades de los Estados Unidos (CDC, por sus siglas en inglés) en los Estados Unidos ocurrió un total de 4.5 millones de mordeduras ocasionadas por perros, causando alrededor de veinte (20) muertos y 756,000 lesiones que requirieron atención médica. **Los niños son las víctimas más frecuentes. Se estima que ocurren 44,00 anuales en la cara de los niños, de los cuales 16,000 requieren cirugía plástica.**
>
> ...
>
> **Aunque no todos los perros de la Raza Pit Bull son malos, si son perros muy fuertes con gran potencial de ocasionar daños severos con sus quijadas, debido a sus características físicas....**(Énfasis suplido).

Por otro lado, una compilación de reportajes periodísticos publicados en los Estados Unidos y Canadá, realizada por el reconocido periodista y ambientalista Merritt Clifton, editor de la prestigiosa revista *Animal People*, reveló que en los últimos 17 años los perros de la raza Pit bull terrier han ocasionado 153 muertes y 777 mutilaciones, duplicando y en algunos casos hasta triplicando los daños causados por cualquier otro can. M. Clifton, *Dog attack deaths and maimings, U.S. & Canada September 1982 to December 22, 2009*.

En vista de lo anterior, estimo que el problema con este tipo de can no es necesariamente su agresividad, esto es, la frecuencia con que pueda atacar a un ser humano –la cual puede ser similar a la de otros canes que no se encuentran cubiertos por la Ley Núm. 158, *supra*– sino su capacidad para producir un daño grave y permanente a su víctima.

El Juez Presidente señor Hernández Denton emitió una Opinión Disidente a la cual se unió el Juez Asociado señor Rivera Pérez.

La Juez Asociada señora Rodríguez Rodríguez hace constar que:

> Disiente de la Sentencia emitida por el Tribunal en este caso, pues entiende que la disposición que prohíbe la posesión y venta de los perros Pitbull Terriers y obliga su sacrificio, es inconstitucional por violar la cláusula de un solo asunto contenida en la Sección 17 del Artículo III de la Constitución del Estado Libre Asociado de Puerto Rico. La Ley Núm. 158 de 23 de julio de 1998, 5 L.P.R.A. secs. 1601-10, la cual establece la prohibición de la tenencia de perros Pitbull Terriers, es una enmienda a la Ley Núm. 70 de 23 de junio de 1971. Esta última otorgaba al Secretario de Agricultura la facultad de designar aquellos animales que debían prohibirse por ser perjudiciales **para la agricultura, las industrias agropecuarias, y la horticultura, o que fueran rapaces o venenosos.** *Véase* 1971 Leyes de Puerto Rico 221. Surge claramente de lo anterior que la Ley Núm. 158 es una enmienda que introduce una materia extraña a la Ley Núm. 70, pues los perros Pitbull Terriers- y su alegada peligrosidad para los ciudadanos- en nada se relacionan con el perjuicio que se le puedan causar a los cultivos o a la industria agropecuaria, además de no ser rapaces o venenosos. Por lo tanto, se trata de una enmienda extraña y no relacionada al asunto regulado originalmente por la Ley Núm. 70, por lo que es inconstitucional al amparo de la cláusula de un solo asunto. Véase, *Ismael Herrero, Jr. v. Sec. D.T.O.P.*, res. el 16 de junio de 2010, 2010 T.S.P.R. 95, 179 D.P.R. ___ (2010).

El Juez Asociado señor Martínez Torres está inhibido.

                                 Aida I. Oquendo Graulau
                               Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Alfredo Rolón López

   Peticionario

    v.                    AC-2008-101     Certiorari

Departamento de Agricultura,
Estado Libre Asociado de P.R.

   Recurridos

Opinión disidente emitida por el Juez Presidente señor HERNÁNDEZ DENTON a la cual se une el Juez Asociado SEÑOR RIVERA PÉREZ.

San Juan, Puerto Rico, a 20 de julio de 2010.

Disentimos enérgicamente de la decisión de este Tribunal porque tiene como resultado directo no sólo la eutanasia de Zafira, la cachorra objeto de este litigio, sino que implicará el exterminio a largo plazo de decenas de miles de mascotas en Puerto Rico.

En el caso de autos el Tribunal de Apelaciones, Región Judicial de San Juan (Martínez Torres, J., Feliciano Acevedo, J., Escribano Medina, J.) confirmó una resolución del Secretario de Agricultura que ordenó la eutanasia de una cachorra Pitbull llamada Zafira. Tras examinar detenidamente el expediente ante nuestra consideración, entendemos que la Ley Núm. 158 de 23

de julio de 1998, 5 L.P.R.A. sec. 1601 *et seq*, que prohíbe la posesión y venta de los perros Pitbull (Ley Núm. 158) e impone a sus dueños la obligación de sacrificarlos so pena de sufrir multas y penas de cárcel, es inconstitucional.

Contrario a los miembros de este Tribunal que están de acuerdo con confirmar la sentencia recurrida, consideramos que dicho estatuto y su reglamento violan el derecho a un debido proceso de ley, en su vertiente sustantiva, consagrado en el Artículo II, Sección 7 de nuestra Constitución. Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1. Por ello, y porque lo contrario implica avalar el exterminio indiscriminado de miles de animales, disentimos. Por ende, revocaríamos la sentencia recurrida.

I.

Como un regalo del Día de Reyes de 2008, llegó a la casa de la familia del Sr. Alfredo Rolón López una cachorra Pitbull a la que llamaron Zafira. Pocos meses después, un agente de la Policía de Puerto Rico intervino con el señor Rolón López y presentó una querella en su contra al percatarse de que tenía a Zafira en su hogar, en violación a la prohibición sobre la tenencia de Pitbulls contenida en la Ley Núm. 158 y sin estar registrada en el Registro de Pitbulls del Departamento de Agricultura. A raíz de dicha intervención, un veterinario del Departamento de Agricultura dictó una orden que dispone que Zafira debe ser sacrificada.

Por su parte, el señor Rolón López solicitó la revisión de dicha orden ante el Departamento de Agricultura. Surge del Informe del Oficial Examinador que atendió el asunto, que

durante la vista declararon el Dr. Héctor Ortiz Llavona, veterinario, en representación del Departamento de Agricultura, y el señor Rolón López. En su Informe, el Oficial Examinador concluyó que Zafira es una Pitbull que no está registrada en el Departamento de Agricultura, que está vacunada según lo requiere la ley, que es mansa, saludable y que es considerada parte de la familia del señor Rolón López. Determinó, a base del testimonio del doctor Ortiz Llavona, que la mayoría de las mordeduras de perros reportadas son hechas por perros de razas distintas a los Pitbulls, incluso de razas cuya cantidad en la isla es menor.

En las conclusiones de derecho que plasmó el Oficial Examinador en su Informe, concluyó que la prohibición de los Pitbulls añadida mediante la Ley Núm. 158, *supra,* a la Ley Núm. 70 de 23 de julio de 1998 (Ley Núm. 70), es un "contrasentido absoluto". Informe del Oficial Examinador, Anejo II, Apéndice del recurso de *certiorari*. A esos efectos, éste señaló que el lenguaje expreso de la Ley Núm. 70, faculta al Secretario de Agricultura a prohibir aquellas especies de, entre otros, mamíferos silvestres, que considere perjudiciales para la agricultura e industrias afines y que por su rapacidad o venenosidad sean peligrosos para los seres humanos.[1] A raíz de ello, afirmó que el Pitbull, al ser un

---

[1] Cabe señalar que la única vez que el Secretario de Agricultura ejerció sus facultades reglamentarias bajo el referido estatuto lo hizo para probar el Reglamento Para Designar como Animales Perjudiciales a Ciertas Especies Detrimentales [sic] a los Intereses de la Agricultura y de la Salud Pública. Reglamento Núm. 7299 del Departamento de Agricultura de 7 de agosto de 2007. Mediante el referido reglamento se prohibió la importación y tráfico en Puerto

mamífero doméstico, no se encuentra dentro de aquellos que podrían ser prohibidos bajo este estatuto, pues la ley solo le faculta a prohibir mamíferos silvestres perjudiciales a la agricultura. Concluyó, además, que al no ser el perro un animal rapaz ni venenoso tampoco puede ser prohibido bajo este estatuto.

No obstante, al realizar su recomendación, el Oficial Examinador indicó que "en esta instancia adjudicativa no tenemos facultad para determinar que una ley es inconstitucional. Ello sólo puede hacerlo un Tribunal". *Íd*. Por ello, el Oficial Examinador indicó que estaba obligado a confirmar la orden de eutanasia y así lo hizo.

Por su parte, el Secretario de Agricultura emitió una resolución en la que dispuso que "[l]uego de estudia[r] el [Informe del Oficial Examinador] lo adoptamos en su totalidad por encontrarlo conforme a derecho y lo hacemos formar parte de esta Resolución". Resolución del Departamento de Agricultura, Anejo II, Apéndice del recurso de *certiorari*.

Inconforme, el señor Rolón López acudió al Tribunal de Apelaciones. Alegó, en primer lugar, que la Ley Núm. 158 es inconstitucional por violar la cláusula de igual protección de las leyes. Además, argumentó que la vista administrativa que se le proveyó no contó con las garantías mínimas del debido proceso de ley procesal, ya que era una vista pro forma en la que no se le permitió demostrar que Zafira no representa peligro para los ciudadanos. Arguyó también que la

---

Rico de tres tipos de monos: mono patas, mono *Rhesus* y mono ardilla.

Ley Núm. 158 es contraria al debido proceso de ley sustantivo porque constituye una medida arbitraria y caprichosa que no responde a un interés legítimo del Estado. Por último, adujo que la Ley Núm. 158 adolece de vaguedad, debido a que la descripción que provee de los animales prohibidos es insuficiente.

Estando pendiente el recurso ante el Tribunal de Apelaciones, el Secretario de Agricultura emitió la Orden Administrativa 2008-48 de 27 de octubre de 2008. En ésta, ordenó la paralización de todos los casos relacionados a la Ley Núm. 158 ante dicha agencia hasta tanto el referido foro resolviera tanto el recurso presentado por el señor Rolón López como otro presentado por la Sra. Fátima Montañez Vargas. Prohibió, además, a todos los veterinarios del referido departamento dictar órdenes de eutanasia.

Ese mismo día, el Tribunal de Apelaciones emitió una sentencia en la que confirmó la orden de eutanasia recurrida.[2] El foro apelativo intermedio estimó que en la vista administrativa se cumplió con el debido proceso de ley procesal, porque el señor Rolón López tuvo una oportunidad justa de ser oído. Concluyó, además, que, al ser el Pitbull un bien ilegal *per se*, no procedía su devolución una vez

---

[2] El foro apelativo intermedio también emitió otra sentencia en la que confirmó la orden de eutanasia dictada contra otro Pitbull en el caso de la señora Montañez Vargas. Véase Fátima Montañez Vargas v. Departamento de Agricultura, KLRA-2008-01296.

confiscado.[3] En cuanto al planteamiento de vaguedad, determinó que cualquier persona de inteligencia promedio podría concluir que un animal que exhibe las características descritas en el estatuto es un Pitbull. No obstante, el Tribunal de Apelaciones no se expresó en cuanto a los señalamientos del señor Rolón López relativos a la constitucionalidad de la Ley Núm. 158 a la luz del debido proceso de ley sustantivo y a la igual protección de las leyes.

Ante esta determinación, el señor Rolón López acudió ante nos mediante un recurso de apelación, el cual acogimos como un *certiorari*. En esencia, alegó que el Tribunal de Apelaciones erró al determinar que la vista administrativa cumplió con el debido proceso de ley procesal y al resolver que la Ley Núm. 158 no adolece de vaguedad. Por último, sostiene que dicho foro erró al no atender sus señalamientos en lo que respecta a la validez del estatuto a la luz de las garantías constitucionales sobre el debido proceso de ley sustantivo y la igual protección de las leyes.

Examinado el recurso, acordamos expedir. La Procuradora General compareció y alegó, en síntesis, que la Ley Núm. 158 no adolece de vaguedad porque provee una descripción adecuada de los perros prohibidos, que no viola las garantías constitucionales al debido proceso de ley en su vertiente sustantiva y a la igual protección de las leyes y que la

---

[3] Sin embargo, según se desprende del expediente, Zafira nunca ha sido confiscada y ha permanecido en el hogar del señor Rólon López en todo momento.

vista administrativa cumplió con el debido proceso de ley procesal.[4]

Lamentablemente no hemos logrado consensuar una postura en cuanto a la correcta resolución de esta controversia. Ello a pesar de que es precisamente ante los casos extraordinarios como éste que debemos ejercer con prudente arrojo el poder de revisión judicial que la Constitución deposita en esta Curia y, por ende, en cada uno de sus miembros. No obstante, y en vista de que por estar igualmente divididos se ha confirmado la sentencia recurrida, nos vemos obligados a plasmar nuestro parecer para que no quede duda de que hubiésemos revocado la sentencia recurrida.

## II.

### A.

La Ley Núm. 70 fue aprobada por la Asamblea Legislativa en 1971 para, según su Sección 1, otorgar al Secretario de

---

[4] El señor Rolón López también alegó que el Tribunal de Apelaciones se equivocó al determinar que el Informe del Oficial Examinador, según fue adoptado por el Secretario de Agricultura, confirmó la orden de eutanasia. No le asiste la razón. Surge claramente del Informe del Oficial Examinador que éste recomendó confirmar la orden de eutanasia. Este hecho es independiente de que también haya expresado en sus conclusiones de derecho tener dudas sobre la constitucionalidad de la Ley Núm. 158.

Tampoco procede analizar si la Ley Núm. 158 adolece de vaguedad, pues en el caso que nos ocupa el señor Rolón López no ha negado que Zafira sea una Pitbull. De hecho, el señor Rolón López registró a Zafira en la Federación Canófila de Puerto Rico como una *American Pitbull Terrier*, y en el expediente consta una carta suscrita por el presidente de dicha organización en la que da fe de ello. Por ende, debido a que en el caso ante nos no se ha alegado que la Ley Núm. 158 resulta inconstitucional por vaguedad en su aplicación respecto al objeto de la controversia, es decir, respecto a Zafira, es improcedente indagar más allá en cuanto a este señalamiento de error.

Agricultura la facultad de designar aquellos peces, moluscos, crustáceos, anfibios, reptiles, aves silvestres, microorganismos, insectos, mamíferos silvestres, o de sus huevos o crías, cuya introducción, posesión, adquisición, venta y traspaso deben estar prohibidas por ser perjudiciales para la agricultura, las industrias agropecuarias, la horticultura, la silvicultura o la vida silvestre, o que por sus características de rapacidad o venenosidad puedan constituir una amenaza o riesgo a la vida o seguridad de los humanos. 5 L.P.R.A. sec. 1601.

La Ley Núm. 158 enmendó la Sección 1 de la Ley Núm. 70 para prohibir la introducción, importación, posesión, adquisición, crianza, compra, venta y traspaso de cualquier naturaleza **de los perros conocidos como Pitbull Terriers, e híbridos producto de cruces entre éstos y perros de otras razas**. *Íd*. En específico se prohíben los cruces entre bulldogs y terriers y se define como una raza del bull terries que incluye los Staffordshire Bull Terries, American Staffordshire Terriers, American Pit Bull Terries y mezclas de éstos y otras razas de terriers. *Id.* **Nótese que al prohibirse también las mezclas, es decir a los satos que surjan de los cruces de los perros mencionados que, de por sí, supuestamente son mezclas de bulldogs y terriers, aumenta exponencialmente la cantidad de animales que están sujetos a la Ley Núm. 158.**

En la Exposición de Motivos de esta ley el legislador expresó que los Pitbulls son extremadamente peligrosos; que han atacado y mutilado a cientos de ciudadanos; que muchos

estados han optado por prohibirlos, y que así debía procederse para poner fin a la situación. Exposición de Motivos, Ley Núm. 158, 1998 (Parte 1) Leyes de Puerto Rico, 626. Con dicho propósito en mente, el legislador aprobó una medida de vigencia inmediata, dirigida a conseguir el exterminio de los Pitbulls de la Isla.

La Ley Núm. 158 dispuso que toda persona que poseyera uno de estos perros a la fecha de su aprobación podría inscribirlo, dentro de un "periodo de gracia", en un registro que debió haberse creado a esos fines en el Departamento de Agricultura. 5 L.P.R.A. sec. 1601.[5] El periodo de gracia que se estableció inicialmente para la inscripción en el registro fue de nueve meses a partir de la aprobación de la Ley Núm. 158, pero luego se amplió a un año, mediante la Ley Núm. 111 de 30 de abril de 1999, por lo que culminaría el 23 de julio de 1999. 5 L.P.R.A. sec. 1601. Según las medidas en controversia, luego de dicha fecha, un Pitbull que no esté registrado podrá ser incautado por el Secretario de Agricultura o destruido de la forma que dicho funcionario considere más conveniente. 5 L.P.R.A. sec. 1605.

No obstante, el registro fue creado mediante reglamento el 18 de noviembre de 1999, luego de que el periodo de gracia

---

[5] La Ley Núm. 158 también dispone que, para poder ser inscritos en el registro, los perros debían ser esterilizados y tatuados con un signo indicativo de que habían sido sometidos a este proceso quirúrgico. 5 L.P.R.A. sec. 1601. Una vez se presentara la solicitud de inscripción con los demás documentos requeridos y se pagara una cuota de $25, el Departamento de Agricultura emitiría una placa y un certificado de registro. *Íd.* La placa estaría gravada con el número asignado al perro en el registro y debía ser fijada en su collar. *Íd.*

dispuesto en la Ley Núm. 158 expirara. Véase el Reglamento para Prohibir la Introducción, Importación, Posesión, Adquisición, Crianza, Venta y Traspaso en Puerto Rico de los Perros conocidos como "Pitbull Terriers" y sus Cruces, así como para Establecer un Registro de dichos Perros Existentes en Puerto Rico, Reglamento Núm. 6045 del Departamento de Agricultura de 18 de noviembre de 1999. Ello, pues, el periodo de gracia había finalizado el 23 de julio de 1999, cuatro meses antes de que se aprobara el referido reglamento. Es decir, contrario a lo establecido en la ley, nunca hubo un periodo de gracia ya que el registro no se creó a tiempo y los ciudadanos nunca tuvieron la oportunidad real de inscribir sus Pitbulls en el registro.

A pesar de que el registro no se estableció dentro del periodo dispuesto en la ley, porque el reglamento que lo creó se aprobó luego de que el periodo expirara, el Artículo VII de dicho reglamento dispone que todo perro Pitbull que no esté registrado será considerado ilegal y estará sujeto a la eutanasia compulsoria. Art. VII, Reglamento Núm. 6045, *supra*. Este artículo también establece que el dueño del perro será responsable de los costos de la eutanasia compulsoria y la disposición del cuerpo de su mascota. *Íd.*

**Además de verse obligado a sacrificar a su perro y a sufragar los costos de ello, el dueño del animal también puede ser castigado con una multa de hasta $1,000, pena de cárcel de hasta un año, o ambas, a discreción de tribunal.** 5 L.P.R.A. sec. 1610; Art. X del Reglamento Núm. 6045, *supra*. Los reincidentes enfrentan multas de $5,000, pena de

reclusión de tres años, o ambas, a discreción del tribunal. 5 L.P.R.A. sec. 1610; Art. X del Reglamento Núm. 6045, *supra*.

**Claramente, el resultado pretendido mediante la implantación de la prohibición absoluta, la eutanasia compulsoria de los animales y las multas y las penas de cárcel a sus dueños es el exterminio de los Pitbulls y sus cruces de la Isla.** Ello, pues se dispuso que los perros que estuviesen vivos al momento de aprobarse la Ley Núm. 158, y aquellos que nacieran dentro del año luego de ser aprobada debían ser esterilizados y registrados. Asimismo, los que no hubiesen sido registrados deben ser sacrificados. Sin embargo, como el registro no fue creado dentro del periodo dispuesto en la Ley Núm. 158, el resultado neto de la implantación de dicha ley y su reglamento es que todos los Pitbulls y sus cruces en Puerto Rico se consideran ilegales y deben ser sacrificados por sus dueños.

Expuesto el contenido de la Ley Núm. 158 y su reglamento, resulta necesario reseñar el contexto en el que fueron aprobados ambos preceptos y la situación actual en Estados Unidos y Puerto Rico.

B.

Como señalamos anteriormente la Ley Núm. 158 fue aprobada en 1998. En ese momento, y a lo largo de las décadas de los ochentas y los noventas, hubo un auge de este tipo de prohibiciones en los Estados Unidos. Ello generó, a su vez, múltiples litigios en los que se cuestionó la constitucionalidad de las medidas. Salvo puntuales

excepciones, la constitucionalidad de las leyes y ordenanzas fue sostenida en virtud del poder de razón de Estado.

En 1994, el Profesor M. Velázquez Rivera realizó un análisis de los distintos tipos de restricciones existentes en los Estados Unidos. Véase M. Velázquez Rivera, *Validez Legal de la Reglamentación por la Asamblea Legislativa de la Importación, Venta y Posesión en Puerto Rico de Perros de la Raza Pit Bull*, 63 Rev. Jur. U.P.R. 1 (1994). En su análisis reseñó algunos casos en los que se sostuvo la validez de ciertas ordenanzas municipales en la Corte Federal para el Distrito Sur de Ohio, la Corte de Apelaciones de Wisconsin y la Corte de Apelaciones de Ohio, entre otras. Al analizar un posible ataque constitucional bajo el debido proceso de ley en su vertiente sustantiva, el referido autor expresó que no hallaba impedimento alguno bajo el debido proceso de ley sustantivo a que el Estado prohíba la posesión de Pitbulls y aun ordene que sean sacrificados. *Íd.*, pág. 15. Sin embargo, también señaló que, en las jurisdicciones en las que se adopta la posición que denominó "radical" de prohibir de forma absoluta los Pitbulls, las medidas no aplican a los dueños que ya los tenían y que los inscriban en los registros correspondientes. *Íd.*, págs. 7, 13.

En años recientes el panorama jurídico en los Estados Unidos ha cambiado drásticamente. Actualmente, diez estados prohíben a sus municipios aprobar ordenanzas para regular razas específicas.[6] Un solo estado, Ohio, cuenta con

---

[6] Estos estados son: Florida, Illinois, Maine, Minnesotta, New Jersey, New York, Oklahoma, Pennsylvania,

legislación estatal que impone restricciones sobre los Pitbulls, los que define como perros peligrosos en su legislación sobre la tenencia de perros. Véase Ohio Rev. Code Ann. Sec. 955.01 *et seq.* (2010). Allí se exige que todos los perros mayores de tres meses, sin distinción de raza, estén registrados en los registros municipales de mascotas. Ohio Rev. Code Ann. Sec. 955.01 (2010). Nótese, sin embargo, que en dicho estado sólo se regula estrictamente la posesión de los Pitbulls y los demás perros que califica como peligrosos mediante requisitos sobre el confinamiento al que deben ser sometidos, el uso de bozales y los seguros de responsabilidad que deben adquirir sus dueños, entre otros. Ohio Rev. Code Ann. Sec. 955.22(D) (2010). **Es decir, en Ohio, el estado cuya legislación es la más estricta respecto a los Pitbulls, su tenencia no se prohíbe de forma absoluta ni se ordena su eutanasia automática. Allí solamente se puede ordenar la eutanasia de manera adicional o alternativa a otras sanciones en casos específicos**. Así, por ejemplo, procede la eutanasia compulsoria cuando han sido quirúrgicamente silenciados, lo cual está prohibido en los Pitbulls. *Íd.*; Ohio Rev. Code Ann. Sec. 955.99(f) (2010).

**Hoy día ningún estado ordena la eutanasia compulsoria y automática de todo Pitbull dentro de los límites de su**

---

Texas y Virginia. S. Gray Hussain, *Attacking the Dog-bite Epidemic: Why Breed-specific Legislation Won´t Solve the Dangerous-Dog Dilema,* 74 Fordham L. Rev. 2847, 2860 n.115 (2004). En California una ley estatal permite ordenanzas municipales que prescriban la esterilización de ciertas razas. No obstante, se prohíbe que una raza en específico sea clasificada como peligrosa *per se*. *Íd*.; Cal. Health & Safety Code sec. 122331 (2009).

**jurisdicción.**[7] El hecho de que ningún estado prohíba específicamente a los Pitbulls no significa que éstos no hayan tomado medidas estrictas para proteger a sus constituyentes de ataques por parte de perros. La gran mayoría de los estados han optado por regular la posesión de lo que denominan "animales peligrosos".

A la luz de estos cambios en los Estados Unidos, nuestra Legislatura aprobó recientemente el Proyecto de la Cámara 1890 de 18 de agosto de 2009 en un esfuerzo por armonizar nuestra legislación con la corriente prevaleciente en los estados. Según indica su título, el P. de la C. 1890, *supra*, fue creado para "Establecer las Obligaciones de los Dueños y Guardianes de Animales Domésticos Peligrosos y Potencialmente Peligrosos; y Enmendar la Ley Núm. 70 de junio de 1971, según enmendada, a los Fines de Eliminar lo Incompatible con la Nueva Norma".

El propósito de dicho proyecto fue derogar la Ley Núm. 158 y establecer las restricciones aplicables a los dueños de animales peligrosos y potencialmente peligrosos según allí se definían. En la Exposición de Motivos del P. de la C. 1890, *supra*, se expresó:

> **Es nuestra opinión que mediante la aplicación de la referida Ley Núm. 70 [según enmendada por la Ley Núm. 158, *supra*] se cometió un error al basarse en la premisa de que sólo los perros "Pitbull" son peligrosos.** Es preciso indicar que la Ley Núm. 70, antes citada, fue adoptada aún cuando grupos de interés sobre animales que participaron en las vistas públicas sostuvieron su firme oposición en

---

[7] No obstante, en algunos estados en los que no se ha proscrito la legislación sobre razas en específico hay municipios y ciudades en los que existen ordenanzas que prohíben la posesión de Pitbulls.

contra de dicha Ley. Exposición de Motivos, P. de la C. 1890, *supra*.

El Informe sobre dicho proyecto de la Comisión de Seguridad Pública y Asuntos de la Judicatura del Senado de 12 de noviembre de 2009, recomendó la aprobación del proyecto. Asimismo, el Segundo Informe Positivo con Enmiendas sobre el P. de la C. 1890, *supra*, de la Comisión de Recursos Naturales, Ambientales y de Energía de la Cámara de Representantes de 30 de septiembre de 2009, reseña las ponencias positivas sobre el proyecto que sometieron el Departamento de Justicia, el Departamento de Agricultura, la Policía de Puerto Rico, el Colegio de Médicos Veterinarios, la Organización de Pitbulls de Puerto Rico y la Federación Canófila de Puerto Rico.

En el Informe se reseña extensamente el contenido de la ponencia que ofreció el Colegio de Médicos Veterinarios de Puerto Rico. Esta agrupación profesional expresó que, al igual que la American Veterinary Medical Association, no apoyan la prohibición absoluta de los Pitbulls pues los estudios científicos demuestran que no son una amenaza mayor para la sociedad que cualquier otro tipo de perro. Indicaron, además, que según la Dra. Karen Overall, veterinaria experta en comportamiento animal y profesora del Departamento de Psiquiatría en la Escuela de Medicina de la Universidad de Pennsylvania, las razas que ocupan los primeros lugares en las listas de mordeduras son, por lo general, las razas más populares en la época por lo que ello se debe tener en cuenta al determinar la frecuencia con la que muerden. La Dra.

Overall también sostiene que el término "Pitbull" se emplea para describir un gran número de tipos de perro sin considerar su base genética, por lo que muchas veces se identifica a un perro como tal cuando, en realidad, no lo es. Por otro lado, el Colegio de Médicos Veterinarios también basó su ponencia en los estudios realizados por el Dr. Randall Lockwood, experto en comportamiento animal e investigador de la Sociedad Protectora de Animales de Estados Unidos. Según los estudios realizados por este experto, no hay diferencias de comportamiento que indiquen que los Pitbulls son más peligrosos que cualquier otro tipo de perro.[8]

Cabe señalar que, el referido informe concluye expresando que el P. de la C. 1890, *supra*, es una medida **"de justicia para miles de ciudadanos puertorriqueños[…]. La prohibición existente en la actualidad no adelanta ningún fin público ni responde a la realidad del manejo responsable por la mayoría de los poseedores de un perro de la raza 'pitbull'"**. Informe de la Comisión de Recursos Naturales, Ambientales y de Energía de la Cámara de Representantes sobre el P. de la C. 1890, *supra*.

El proyecto en cuestión fue aprobado por la Asamblea Legislativa y enviado al Gobernador para su firma. No obstante, éste lo vetó. Tomamos conocimiento oficial de un comunicado emitido por la Oficina de Prensa de la Fortaleza, en el que se reseñaron las razones que motivaron dicho

---

[8] Véase Informe sobre el P. de la C. 1890 de la Comisión de Seguridad Pública y Asuntos de la Judicatura del Senado de 12 de noviembre de 2009.

veto. En éste se indicó que el Primer Ejecutivo no estaba de acuerdo con la carga económica que supondría obtener el seguro de responsabilidad que requería la medida y que "las imposiciones que se encuentran en este proyecto sobre el confinamiento de los animales atentarían contra el bienestar y el trato justo de todo animal doméstico". Comunicado de Prensa, "Gobernador veta ley de animales domésticos", 1 de enero de 2010, http://www.fortaleza.gobierno.pr/news_detalle.php?id=485.

Asimismo, tomamos conocimiento oficial de que la Cámara de Representantes aprobó la Resolución Conjunta de la Cámara 443 de 18 de mayo de 2009 con el visto bueno de la Comisión de lo Jurídico y Ética. A través de la referida resolución, se buscaba establecer una moratoria en todos los casos relacionados a la Ley Núm. 158. La Exposición de Motivos de la referida resolución dispone:

> **Información provista por oficiales del Departamento de Agricultura y la comandancia del área de Carolina han confirmado que en el año 2008 se han sacrificado a [sic] sobre ochocientos (800) canes de la raza "Pit-Bull Terrier". Dicho exterminio se realizó aún cuando el caso de Alfredo Rolón López vs. Departamento de Agricultura se ventila en los Tribunales[…]. La inoperancia del registro de mascotas agrava la situación actual, y con más razón esta Asamblea Legislativa debe promover una moratoria a los efectos de detener los sacrificios injustificados**. (Énfasis suplido). Exposición de Motivos R.C. de la C. 443, *supra*.

Visto lo anterior, pasemos a exponer el derecho aplicable a una controversia sobre el debido proceso de ley.

III.

La Sección 7 del Artículo II de la Constitución de Puerto Rico dispone que "ninguna persona será privada de su libertad o propiedad sin debido proceso de ley". Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1. Como es sabido, el debido proceso de ley se manifiesta en dos dimensiones: sustantiva y procesal. En su vertiente sustantiva, el debido proceso de ley impide que, al aprobar leyes o al actuar, el Estado afecte de manera irrazonable, arbitraria o caprichosa los intereses de propiedad o libertad de los ciudadanos. Rivera Rodríguez & Co. v. Lee Stowell, 133 D.P.R. 881, 887-88 (1993). Por su parte, el debido proceso de ley procesal garantiza que al verse afectado algún derecho de propiedad o de libertad el ciudadano tendrá acceso a un proceso justo, equitativo e imparcial. Íd. Es por ello que, como cuestión de umbral, es preciso determinar si estamos ante una controversia que involucra un derecho de propiedad o libertad.

Hace casi medio siglo, en Infante v. Leith, 85 D.P.R. 26 (1962), reconocimos que en el ordenamiento jurídico puertorriqueño los perros son considerados objetos de derecho susceptibles de ser parte del patrimonio individual. En dicho caso, uno de los más pintorescos en nuestro acervo jurisprudencial, el perro de los demandantes, un Fox Terrier llamado Nerón, fue atacado por los perros de los demandados mientras se encontraba en el patio de sus dueños cavando un hueco para ocultar una presa. El foro de instancia se negó a conceder cuantía alguna en virtud del Artículo 1805, 31

L.P.R.A. sec. 5144, por los daños emocionales sufridos por su dueña al ver el mal estado en el que quedó Nerón. Al revocar esa determinación expresamos que:

> [e]n nuestra legislación están considerados los animales como objetos de derecho susceptibles de formar parte de relaciones reales y contractuales. Constituyen parte del patrimonio individual. Sobre ellos, así como sobre los demás bienes que posee el hombre, se ejerce el derecho de disfrute, considerado uno "fundamental del ser humano". Constitución Art. II(7). Infante v. Leith, *supra*, pág. 39.

En aquel momento nuestra decisión contrastó con aquella tomada por el Tribunal Supremo de los Estados Unidos a finales del siglo XIX en Semtell v. New Orleans, 166 U.S. 698 (1897). Allí, el máximo foro federal determinó que el derecho a la propiedad sobre los perros era imperfecto, por lo que no se encontraba dentro del ámbito de protección de la Constitución de los Estados Unidos. Razonó que, a diferencia de otros animales domésticos, como los caballos y las vacas, cuyo valor económico es intrínseco, los perros son como los gatos y los pájaros, porque se poseen por placer, curiosidad o capricho. *Íd.*, pág. 694. Por ello, concluyó que los perros no están protegidos por el debido proceso de ley de la Enmienda XIV de la Constitución de los Estados Unidos. Emda. XIV, Const. EE.UU., L.P.R.A., Tomo 1. No obstante, expresó que si los perros fueran considerados propiedad en todo el sentido de la palabra, aún estarían sujetos al poder de razón de Estado. *Íd.*, págs. 695-696. Véase, además, Nicchia v. People of the State of New York, 254 U.S. 228, 231 (1924).

En los últimos años, la mayoría de las cortes de circuito federales se han apartado de la decisión del Tribunal Supremo

de Estados Unidos en Semtell v. New Orleans, *supra*, y han reconocido que el derecho a la propiedad sobre los perros y los gatos es pleno y merece protección constitucional. Así, por ejemplo, la Corte Federal de Apelaciones para el Primer Circuito determinó recientemente que los contornos del derecho constitucional a la propiedad sobre los perros están lo suficientemente delimitados como para denegar el reclamo de inmunidad cualificada de un alcalde que ordenó la incautación de todos los perros que se encontraran en los residenciales públicos de su municipio. Maldonado v. Fontanez, Municipality of Barceloneta, 568 F.3d 263 (1er Cir. 2009).

Allí, veinte familias residentes de residenciales públicos del Municipio de Barceloneta presentaron una demanda ante la Corte Federal de Distrito para el Distrito de Puerto Rico contra el alcalde del referido municipio. Luego de que el alcalde presentara una moción de desestimación, la cual fue denegada, recurrió al Tribunal de Apelaciones para el Primer Circuito. El referido foro describió los acontecimientos que dieron lugar a la demanda de esta forma:

> [e]mpleados uniformados del Municipio [de Barceloneta] y trabajadores de Animal Control Solutions ('ACS'), un contratista privado contratado por el Municipio, llegaron a tres residenciales públicos y capturaron violentamente a numerosos perros y gatos. Fueron de puerta en puerta y exigieron que los residentes entregaran a sus mascotas so pena de ser desahuciados…. Empleados municipales y trabajadores de ACS también capturaron a varias mascotas que se encontraban en las áreas comunes del residencial, incluso quitándoselas a los niños… Una vez las mascotas eran capturadas, los empleados municipales y los trabajadores de ACS inyectaron a algunos animales una substancia desconocida.

También golpearon violentamente a los animales contra los lados de un camión, causando que algunos residentes creyeran que sus mascotas habían sido matadas en su presencia. Aquellos animales que sobrevivieron el trauma inicial fueron arrojados a sus muertes desde un puente de 50 pies de altura conocido como El Paseo del Indio… Algunos residentes eventualmente encontraron a sus mascotas muertas debajo del puente. Maldonado v. Fontanez, Municipality of Barceloneta, *supra*, pág. 266-267.

Al confirmar en parte la decision de la Corte de Distrito, dicho foro apelativo expresó que, "[a]n individual´s interest in his pet cat or dog does fall within the Fourth Amendment´s prohibition of unreasonable seizures, though we have not addressed the question before… Privately owned pet dogs do qualify as property such that pets are 'effects' under the seizure clause of the Fourth Amendment". *Íd.*, pág. 271. De esta forma, quedó establecido que los perros son propiedad para efectos de la protección contra incautaciones irrazonables de la Cuarta Enmienda de la Constitución de los Estados Unidos, aplicable a los estados a través de la cláusula del debido proceso de ley de la Enmienda XIV de dicha constitución. Emdas. IV y XIV, Const. EE.UU., L.P.R.A., Tomo 1; Maldonado v. Fontanez, Municipality of Barceloneta, *supra*.

Al así resolver, la Corte de Apelaciones para el Primer Circuito se unió a otros seis circuitos que desde 1994 han ido reconociendo el interés propietario constitucionalmente protegido que ostentan las personas sobre sus perros. Véanse Viilo v. Eyre, 547 F.3d 707 (7mo Cir. 2008); Altman v. City of High Point, 330 F.3d 194 (4to Cir. 2003); Brown v. Muhlenberg Township, 269 F.3d 205 (3er Cir. 2001); Fuller v.

Officer Vines, 36 F.3d 65 (9no Cir. 1994); Lesher v. Reed, 12 F.3d 148 (8vo Cir. 1993). **Además, recientemente la Corte de Apelaciones para el Décimo Circuito, al revocar la desestimación de una demanda en la que se cuestionó, a la luz del debido proceso de ley sustantivo, la constitucionalidad de una prohibición similar a la que nos ocupa, reconoció el derecho propietario de los demandantes sobre sus perros.** Dias v. City and County of Denver, 567 F.3d 1169 (10mo Cir. 2009).

A pesar de que reconocemos que en nuestro ordenamiento los perros son propiedad y que igual curso siguen la mayoría de los circuitos federales, ello no los coloca fuera del alcance del poder de razón de Estado, como correctamente estableció el Tribunal Supremo de Estados Unidos en Semtell v. New Orleans, *supra*. Ello, pues, el poder de razón de Estado no se refiere a un poder especializado del gobierno, sino al poder inherente de los gobiernos estatales y locales para proteger la salud, seguridad, moral y bienestar general de las personas dentro de su jurisdicción. J.E. Nowak y R.D. Rotunda, Constitutional Law, 8va ed., St. Paul, West, 2010, sec. 11.1(c), pág. 465. El Profesor M. Velázquez Rivera también reconoció este límite al poder propietario que se ejerce sobre los perros al expresar,

> [e]s cierto que todo dueño de un perro Pit Bull tiene un derecho propietario sobre su animal y que el Estado tiene el deber de respetar ese derecho. Pero, la jurisprudencia constante del Tribunal Supremo de Estados Unidos y de Puerto Rico es clara en el sentido de que el ejercicio del derecho de propiedad no es absoluto. Está supeditado a intereses sociales que se agrupan en el concepto de 'poder de razón de [E]stado' o 'police power'. Velázquez Rivera, *supra*, pág. 15.

Dicho poder del Estado, a su vez, debe respetar los límites impuestos por el debido proceso de ley sustantivo. Marina Ind. v. Brown Boveri Corp., 114 D.P.R. 64 (1983), citando a E.L.A. v. Marquez, 93 D.P.R. 393 (1966) y a A. Roig, Sucrs. v. Junta Azucarera, 77 D.P.R. 342 (1957). En el pasado hemos utilizado dos escrutinios diferentes al revisar una ley bajo la lupa del debido proceso de ley sustantivo. El tipo de escrutinio a ser aplicado dependerá de la naturaleza de la reglamentación en cuestión. Si se trata de una reglamentación socioeconómica, hemos empleado un criterio de racionalidad mínima.

Bajo el referido criterio la medida será válida si responde a un objetivo legítimo del Estado y si está racionalmente relacionada con ese objetivo. *Íd.* Se entiende que una medida está racionalmente relacionada con el objetivo legítimo del Estado si no es arbitraria, irracional o caprichosa y si tiene una relación real y sustancial con él. Salas v. Municipio de Moca, 199 D.P.R. 625, 633 (1987); Marina Ind. v. Brown Boveri Corp., *supra*.

Debemos tener presente siempre que la acción legislativa se presume constitucional, por lo que, al interpretar una ley, los tribunales deben esforzarse por preservarla. E.L.A. v Aguayo, 80 D.P.R. 552, 597 (1958); Nogueras v. Hernández Colón, 127 D.P.R. 405, 412 (1990). Por dicha razón, este Tribunal acertadamente ha declinado entrar a evaluar la sabiduría de las medidas legislativas de carácter socioeconómico. Morales v. Lizarribar, 100 D.P.R. 717 (1972).

Sin embargo, ello no implica que no tengamos la obligación de determinar, en el ejercicio de nuestro deber de revisión constitucional, si una medida de carácter socioeconómico está racionalmente relacionada con un objetivo estatal legítimo cuando un ciudadano reclama la protección de un derecho de propiedad o libertad. Es decir, independientemente del aspecto social o económico que el legislador decida regular en el ejercicio de sus prerrogativas, y, aun ante nuestra deferencia hacia la discreción que tiene para hacerlo, la medida debe respetar el debido proceso de ley sustantivo a la luz de la Sección 7 del Artículo II de la Constitución de Puerto Rico.[9] Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1.

Por su parte, el debido proceso de ley en su vertiente procesal garantiza que el procedimiento mediante el cual se priva a una persona de su propiedad o libertad sea justo y equitativo. Hernández v. Secretario, 164 D.P.R. 390, 395 (2005). El fin medular del debido proceso de ley en su vertiente procesal es que se le provea al ciudadano un procedimiento justo en la resolución de los hechos y derechos

---

[9]Es preciso señalar que, aunque los estándares de adjudicación para medidas socioeconómicas a la luz del debido proceso de ley sustantivo son similares a los aplicables bajo la garantía a la igual protección de las leyes que también se encuentra en la Sección 7 del Artículo II de la Constitución, existe una diferencia fundamental. Según explica el Profesor J.J. Álvarez González, el debido proceso de ley sustantivo exige que la medida sea razonable en relación a su propósito, independientemente de que contenga una clasificación. Por su parte, bajo la igual protección de las leyes se enjuicia la racionalidad de la clasificación a la luz del propósito gubernamental. J.J. Álvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Editorial Temis, 2009, pág. 826.

que sirven de base para las acciones del Estado que le privan de su libertad o propiedad. *Íd.*, citando a <u>López Vives v. Policía de Puerto Rico</u>, 118 D.P.R. 219 (1987).

Luego de que se determina que existe un derecho de libertad o propiedad afectado por una acción gubernamental es necesario determinar qué garantías se le deben ofrecer al ciudadano. <u>Hernández v. Secretario</u>, *supra*, pág. 395. Como es sabido, las exigencias mínimas del debido proceso de ley procesal son: (1) notificación adecuada del proceso; (2) proceso ante un juez imparcial; (3) oportunidad de ser oído; (3) derecho a contrainterrogar testigos y a examinar la evidencia presentada en su contra; (5) tener oportunidad de asistencia de abogado; y, (5) que la decisión se base en el expediente. *Íd.* citando a <u>Rivera Santiago v. Srio. de Hacienda</u>, 199 D.P.R. 265, 274 (1987).

Expuesto el derecho aplicable a la controversia ante nos, procedemos a examinar concretamente los señalamientos del señor Rolón López.

IV.

Examinaremos, en primer lugar, el argumento del señor Rolón López relativo a que la vista administrativa celebrada ante el Departamento de Agricultura fue pro forma y que, por ello, no cumplió con el debido proceso de ley en su vertiente procesal. Específicamente, el señor Rolón López arguye que no se le brindó la oportunidad de probar que Zafira no es una Pitbull agresiva y que, por ende, no se le debe aplicar la Ley Núm. 158. No le asiste la razón.

Según se desprende del Informe del Oficial Examinador adoptado en su totalidad por el Secretario de Agricultura mediante resolución, el señor Rolón López tuvo amplia oportunidad de exponer su posición durante la vista y de ofrecer prueba a su favor. Allí se reseñan, en detalle, todos los argumentos que esgrimió. De hecho, sometió en evidencia, y el Oficial Examinador admitió, copia de la certificación de la vacuna contra la rabia suministrada a Zafira, así como copia de otra consulta veterinaria. Es decir, tuvo y aprovechó la oportunidad que se le brindó de ser oído y presentar prueba a su favor antes de que se confirmara la orden de eutanasia de Zafira, según lo exigen el debido proceso de ley procesal. Hernández v. Secretario, *supra*; 3 L.P.R.A. sec. 2163.

Además, el señor Rolón López no ha alegado que no se haya seguido el procedimiento dispuesto en el Reglamento de Procedimientos Adjudicativos del Departamento de Agricultura. Reglamento Núm. 3784 del Departamento de Agricultura de 6 de febrero de 1989. En él se detalla la forma en que la agencia deberá notificar a las partes, celebrar la vista, crear un expediente y adjudicar la controversia. Art. VII del Reglamento Núm. 3784, *supra*. Tampoco surge del expediente irregularidad alguna en el procedimiento que se siguió ante el Departamento de Agricultura.

Aclarado lo anterior, pasamos a examinar la validez constitucional de la Ley Núm. 158 a la luz del debido proceso de ley sustantivo.

V.

A.

El señor Rolón López sostiene que la Ley Núm. 158 viola el debido proceso de ley sustantivo por resultar irracional y arbitraria en relación con su propósito. Según indicáramos, el debido proceso de ley sustantivo impide que, al aprobar leyes o al actuar, el Estado afecte de manera irrazonable o caprichosa la libertad o la propiedad de las personas. Rodríguez & Co. v. Lee Stowell, *supra*.

Como en nuestro ordenamiento, según reconocimos en Infante v. Leith, *supra*, los animales forman parte del patrimonio individual, toda medida que impacte los intereses propietarios que sobre ellos se ejerzan está sujeta a los límites impuestos por la cláusula del debido proceso de ley sustantivo de la Sección 7 del Artículo II de la Constitución de Puerto Rico. Art. II, Sec. 7, Const. E.L.A., L.P.R.A. Tomo 1. Por supuesto, ello no significa que el Estado esté impedido, en el ejercicio del poder de razón de Estado, de establecer medidas para regular la tenencia de animales en busca de la protección de la salud, la seguridad y el bienestar de las personas.

Según se desprende de la Exposición de Motivos de la Ley Núm. 158, su propósito es proteger a la ciudadanía de los ataques por parte de Pitbulls, perros que describe como animales peligrosos. Exposición de Motivos, Ley Núm. 158, Leyes de Puerto Rico, *supra*. Evidentemente, la protección de la salud y la integridad física de los ciudadanos constituye un propósito legítimo del Estado y el legislador merece

nuestra deferencia en cuanto a la manera en la que persigue la consecución de dicho propósito. No obstante, es necesario que la Ley Núm. 158 y su reglamento guarden una relación racional con este objetivo para encontrarse en armonía con la cláusula sobre el debido proceso de ley, tal como lo exige nuestra Constitución. Es decir, deben cumplir con el escrutinio de racionalidad mínima al que están sujetas las medidas de corte socioeconómico.

Al aplicar este escrutinio no nos debemos limitar a hacer un ejercicio de erudición en el vacío, sino que debemos tener presente la política pública establecida mediante la Ley Núm. 154 de 4 de agosto de 2008, 5 L.P.R.A. 1651 *et seq.*, conocida como la Ley para el Bienestar y la Protección de los Animales. En la Exposición de Motivos de dicha ley se expresó que, durante los últimos años, la visión mundial sobre los animales ha cambiado dramáticamente, ya que éstos se han convertido en partes fundamentales de nuestras vidas y sociedad. Exposición de Motivos, Ley Núm. 154, 2008 (Parte 3) Leyes de Puerto Rico, 231.

Allí también se expresó que los animales son entes sensitivos y dignos de un trato humanitario y que órganos internacionales como la Organización de Naciones Unidas han aprobado declaraciones en las que "se parte de la premisa de que todo animal posee derechos y, en particular, derecho a la existencia, al respeto, a la atención, a los cuidados y a la protección por parte del ser humano".[10] *Íd.* Del texto

_____

[10] Aclaramos que no resolveríamos en este momento si, como indica la Exposición de Motivos de la Ley Núm. 158, los

transcrito se desprende que, en lo que respecta al trato humanitario de los animales, Puerto Rico busca colocarse entre los países cuya política pública es de avanzada. De hecho, la Exposición de Motivos en cuestión concluye estableciendo que **"Puerto Rico debe destacarse como una sociedad sensible y vanguardista, que respeta, protege y cuida de sus animales**. (Énfasis suplido). *Íd.*, pág. 232. Por ello, a la hora de analizar la relación entre la protección de la ciudadanía y la Ley Núm. 158, para determinar si ésta es racional, debemos tener en mente la política pública establecida en la Ley Núm. 154, *supra.*

Como indicamos anteriormente, la Ley Núm. 158 prohíbe de forma absoluta la tenencia de Pitbulls, a no ser que éstos hayan sido inscritos, dentro del año de haber entrado en vigor la prohibición, en un registro que se supone que se haya creado a los efectos. 5 L.P.R.A. sec. 1601. De no estar inscritos en el registro procede su eutanasia compulsoria y la posible imposición de multas y penas de cárcel a sus dueños. Reglamento Núm. 6045, *supra*.

Es necesario tener presente que el Registro de Pitbulls fue creado mediante el Reglamento Núm. 6045, *supra*, casi cuatro meses después de que el periodo de gracia de un año estatuido en la Ley Núm. 158 expirara, por lo que los dueños de Pitbulls nunca tuvieron tiempo de aprovechar el periodo de gracia. En otras palabras, la disposición mediante la que se

animales tienen derechos desde un punto de vista estrictamente jurídico. Mediante el citado texto sólo se busca reseñar las fuentes de las que se nutrió el legislador al establecer la política pública respecto a determinados animales.

estableció el periodo de gracia siempre fue letra muerta, pues nunca existió la posibilidad jurídicamente eficaz de registrar a los perros para eximirlos de la eutanasia compulsoria.[11] Ello tiene como consecuencia que todos los Pitbulls en Puerto Rico deben de ser sacrificados, sin excepción alguna.

Como se colige de lo anterior, la implantación de las medidas contenidas en la Ley Núm. 158 y su reglamento tienen como resultado la erradicación de todos los Pitbulls en Puerto Rico mediante la eutanasia compulsoria. Es decir, para garantizar la seguridad de las personas, el Estado optó por exterminar a todos los perros Pitbulls, forzando a sus dueños a sacrificarlos, so pena de estar expuestos a multas y condenas de reclusión. La cuestión medular ante nuestra consideración es, pues, si entre la protección de la ciudadanía y la eutanasia compulsoria de todos los Pitbulls de la Isla existe una relación racional.

Tras un examen cuidadoso de esta controversia consideramos que la prohibición absoluta de tenencia de Pitbulls así como la falta de un registro, que redundan en la eutanasia de todos los Pitbulls en Puerto Rico, no guardan una relación razonable con el fin de lograr garantizar la seguridad de la ciudadanía. Ello, pues, un conjunto de medidas que causa indefectiblemente la eutanasia de miles de

---

[11] Según se desprende de la Resolución del Secretario de Agricultura en la cual se adoptó el Informe del Oficial Examinador, sólo se inscribieron en el registro 18 perros. Sin embargo, y pesar de que éstos lograron acceso al registro, al momento de su inscripción ya el periodo de gracia había expirado.

mascotas, como Zafira, cuyos dueños las consideran –más que objetos sobre los que ejercen un derecho de propiedad constitucionalmente protegido– parte de su familia, no pueden ser concebidas como medidas que guardan una relación racional con la seguridad de la ciudadanía.

A pesar de la amplia facultad que tiene el legislador para regular la posesión de los perros y demás animales en el ejercicio legítimo del poder de razón de Estado, y que la manera en que escoja ejercerla merece nuestra debida deferencia, entendemos que no puede sostenerse que exista una relación racional entre la búsqueda de la seguridad de la ciudadanía y la Ley Núm. 158 y su reglamento que cumpla con el escrutinio de racionalidad mínima aplicable. Como indicamos anteriormente, Puerto Rico es la única jurisdicción estatal en la que se ordena la eutanasia compulsoria de todo Pitbull, sin excepción. Ello es indicativo de que el exterminio de un tipo de perro no se considera, por ninguno de los cincuenta estados, racionalmente relacionado al fin de garantizar la seguridad de la ciudadanía. Además, la eliminación de toda una clase de perros y sus cruces cuyo comportamiento, según los expertos, no es más peligroso que el del resto de los perros resulta ilógica, sobre todo en vista de la fuerte política pública a favor del trato humanitario de los animales establecida mediante la Ley Núm. 154, *supra*, y de la oposición tenaz que desde hace décadas ejercen los estudiosos del comportamiento animal.[12]

---

[12] En vista de lo anterior, resulta innecesario evaluar la constitucionalidad de la Ley Núm. 158 a la luz de la garantía

**Lo anterior no significa, bajo ningún concepto, que ignoremos el hecho de que cualquier animal doméstico, al igual que los perros aquí envueltos, están en contacto constante con seres humanos a los que pueden hacer daño ya sea mediante su mordida, su fuerza o mediante el contagio de enfermedades. Es por ello, que cada ciudadano que disfruta de un derecho propietario sobre sus animales debe cerciorarse de tomar en todo momento las medidas necesarias para evitar que éstos causen daños a los miembros de su propia familia, a sus vecinos y a cualquiera que pueda entrar en contacto con éstos. De hecho, como es sabido, el Art. 1805 de nuestro Código Civil impone a los poseedores de animales responsabilidad por los daños que éstos causen. 31 L.P.R.A. 5144.**

Recalcamos, además, que el Estado cuenta con amplia facultad para regular la posesión de animales y mascotas y así conseguir garantizar la protección de la ciudadanía. Como señalamos, la Ley Núm. 70 faculta al Secretario de Agricultura para proscribir aquellos animales que sean nocivos para las industrias que regula. 5 L.P.R.A. sec. 1601. Cabe señalar, además, que el Secretario del Departamento de Recursos Naturales está facultado para designar aquellas especies que estime perjudiciales para la vida silvestre de nuestra isla y su hábitat natural. Véase Ley Núm. 241 de 15 de agosto de 1999, conocida como la Ley de Vida Silvestre de 1999, 12 L.P.R.A. 107 *et seq.*

---

constitucional a la igual protección de las leyes y, por ende, no discutiremos el señalamiento del señor Rolón López a esos efectos.

En el caso específico de los perros, el legislador posee amplia facultad para restringir su tenencia en el ejercicio de su poder de razón de estado. De hecho, en la gran mayoría de las jurisdicciones estatales se regula de forma estricta su posesión, sin vulnerar los derechos propietarios de los ciudadanos. Así, por ejemplo, podría exigir que los dueños los inscriban en registros de mascotas, que los custodien de una forma específica dentro y fuera de su hogar y que de no hacerlo cumplan con multas y penas. Incluso, podría ordenar su eutanasia en casos específicos.

La Sentencia emitida en el día de hoy por este Foro constituye una orden *de facto* para que, como ocurrió en este caso, el Estado intervenga con toda familia que tenga un Pitbull en su hogar y le ordene sacrificarlo, so pena de multas y hasta penas de cárcel. Al haberse dividido igualmente, de forma que procedió a confirmar la sentencia recurrida, este Tribunal avala la implantación de un estatuto que es contrario al Art. II, Sec. 7 de nuestra Constitución y cuyo resultado será la eutanasia de miles de mascotas.

Cerradas las puertas de este Tribunal, en las manos de los demás poderes Constitucionales queda el destino de estos animales. No albergamos duda de su inconformidad con la implantación de esta medida, pues ha quedado evidenciado patentemente en varias ocasiones. Así, por ejemplo, el Secretario de de Agricultura paralizó todos los casos relacionados a la Ley Núm. 158 y prohibió a los veterinarios de la agencia que dirige dictar órdenes de eutanasia adicionales. Por su parte, la Asamblea Legislativa aprobó el

P. de la C. 1890, *supra*, en cuya Exposición de Motivos se cataloga la Ley Núm. 158 como un error y cuyo Informe de la Comisión de Recursos Naturales, Ambientales y de Energía de la Cámara de Representantes, *supra*, indica que dicha ley "no adelanta ningún fin público". Además, la Cámara de Representantes aprobó la Resolución de la Cámara 443, *supra*, para establecer una moratoria adicional en los casos relacionados a la Ley Núm. 158 y "detener los sacrificios injustificados". Exposición de Motivos R.C. de la C. 443, *supra*.

En vista de lo anterior, confiamos en que tanto el Poder Ejecutivo como el Legislativo, a diferencia de este Tribunal, llevarán a cabo lo que esté dentro del alcance de sus respectivas facultades para que el Departamento de Agricultura no proceda con la eutanasia de Zafira ni de ninguna otra mascota en virtud de la Ley Núm. 158 y su reglamento.


                              Federico Hernández Denton
                                   Juez Presidente